**131 MAIN STREET ASSOCIATES,
et al. Plaintiffs,**

v.

**Bernhard F. MANKO, a/k/a "Fred" Manko; Jon J. Edelman; Robert G. Bushnell, Jr.; Arbitrage Management, et al., Defendants.**

**No. 93 CIV. 800 (LBS).**

United States District Court,
S.D. New York.

Aug. 8, 1995.

Greenfield Eisenberg Stein & Senior, New York City (Phillip A. Kantor, Jeffrey H. Sheetz, of counsel), for Plaintiffs.

Shereff, Friedman, Hoffman & Goodman, LLP, New York City (Andrew J. Levander, of counsel), for Defendant Bernhard F. Manko.

Rosenman & Colin, New York City (Marshall H. Fishman, of counsel), for Defendants Vincent Tese and James Sinclair.

Esanu Katsky Korins & Siger, New York City (Joel S. Weiss, Kenneth Dana Greenwald, of counsel), for Defendants Barry Lyman and Palisades Planning Corp.

Bricetti & Calhoun, White Plains, NY (Vincent L. Briccetti, of counsel), for Defendants Evelyne H. Simon and Cosmopolitan Planning, Ltd.

Katten Muchin & Zavis, New York City (Richard A. Miller, of counsel), for Defendants Steven Taslitz, Ethan Schwartz, Wade Rowland, and Morris David de Young.

Howard J. Stein, Chicago, IL for Defendant Virginia McGathey.

Jacobson & Triggs, New York City (Gary S. Jacobson, Robert B. Morton, of counsel), for Defendant Alan Steven Cohen.

Lehman & Eilen, Uniondale, NY (Howard S. Eilen, of counsel), for Defendants Joseph Bryant, Robert Carlock, Archibald Devlin, and Eleanor Goudreau.

## OPINION

SAND, District Judge.

This action arises out of failed tax shelters. Plaintiffs are investors who claim they were defrauded in connection with their purchases of limited partnership interests in one or more of eleven limited partnership tax shelters marketed and managed by defendants. Plaintiffs also claim they were defrauded in connection with their investment in discretionary trading accounts maintained and managed by defendants. Plaintiffs base their suit on alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as well as on claims of state law fraud.

The moving defendants assert, inter alia, that the statutes of limitations have lapsed on the various claims, that the complaint fails to allege facts from which it could be inferred that some of the defendants perpetrated or participated in the alleged acts of fraud, and that plaintiffs have failed to plead fraud with particularity.[1]

---

1. Some of the defendants' motions to dismiss the Amended Complaint on statute-of-limitations

## BACKGROUND

The financial transactions at the heart of this action are described in detail in both *United States v. Manko*, 979 F.2d 900 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993), and *Greenwald v. Manko*, 840 F.Supp. 198 (E.D.N.Y.1993). What plaintiffs essentially allege is that, beginning in or around 1977, defendants embarked on a scheme to induce individual investors to invest in what purported to be two types of tax-advantaged investment vehicles: discretionary trading accounts and limited partnerships. Defendants allegedly represented to potential investors that they, or the limited partnerships to be established by them, would enter into profit-motivated transactions in the field of government-backed securities, and that these transactions, precisely because they would be profit-motivated and carry risk, would generate losses that the investors could successfully claim as loss deductions on their individual tax returns. In making their decisions to invest in the trading accounts and the limited partnerships, plaintiffs maintain that they relied upon representations contained in private placement memoranda issued by defendants to the effect that no security transactions would be entered into unless they had enough economic substance to be capable of producing a pre-tax profit. Amended Complaint, dated May 24, 1993 ("Am.Compl."), ¶¶ 55–58.

The fraud in the sale of these tax-deferral investments lay in the fact that defendants allegedly never had any intention of conducting bona fide, profit-driven transactions in the securities markets. Rather, it is alleged that defendants, on their own and through secret oral agreement with a third-party trading entity, orchestrated billions of dollars worth of prearranged and fictitious trades in put options, Treasury Bill straddles, and repurchase agreements. Am.Compl. ¶¶ 59, 66, 73. These paper transactions, which, as one court has put it, consisted of "typing, not trading,"[2] were allegedly rigged from the outset to generate nothing but losses for the trading accounts and the partnerships, which losses were then passed through to the individual investors, who wrongfully (albeit unwittingly) claimed them as deductions on their tax returns. It is further alleged that defendants looted the money that plaintiffs invested in the trading accounts and partnerships by way of the commissions they awarded themselves for their trading account activity; by way of the incentive compensation they paid themselves as managers of the investment vehicles; by way of "fees," disguised as interest expenses, they paid to the third-party trading counterpart of the partnerships; and by way of the wasted operating expenses of the trading accounts and the partnerships. Am.Compl. ¶¶ 106–08, 110.

Plaintiffs' claim that defendants' pattern of fraudulent misrepresentations and bogus trading activity caused them to lose their investments, to lose any chance of earning profit on their investments, to incur large income tax deficiencies and interest penalties as a result of the IRS's disallowance of their tax deductions, and to incur expenses in defending themselves from the IRS's challenges to their tax filings. Am.Compl. ¶ 105.

## DISCUSSION

### A. Statute of Limitations

All of the defendants challenge plaintiffs' claims as time-barred. As noted above, we will treat defendants' limitations defense as one brought on a motion for summary judgment. This means that, in order to prevail, defendants must prove that there is no genuine issue of material fact regarding the timeliness of plaintiffs' action, and that defendants are entitled to dismissal of the Amended Complaint as a matter of law. More

---

grounds are brought pursuant to Rule 12(b)(6), some pursuant to both Rule 12 and Rule 56. In light of the fact that several of the Rule 12(b) movants submitted materials outside the pleadings in connection with their motions, the Court, in an Order dated July 6, 1995, advised the parties that it would treat all of the pending 12(b)(6) motions as motions for summary judgment. The Court then gave the parties two weeks from the date of the Order to file any additional materials pertinent to summary judgment under Rule 56. Only with respect to the statute-of-limitations issue was anything further submitted.

**2.** *United States v. Manko*, 979 F.2d at 903.

specifically, defendants must show that no genuine issue of material fact exists as to whether plaintiffs discovered, or by the exercise of reasonable diligence would have discovered, the facts triggering accrual of the relevant statutes of limitations by the dates identified by the defendants. *In re Integrated Resources Real Estate Sec. Lit.,* 815 F.Supp. 620, 638 (S.D.N.Y.1993).

### 1. RICO

■■■ *General Principles.* The parties are right in emphasizing to the Court that the statute of limitations for RICO actions is somewhat unique. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), established that a four-year limitations period governs civil RICO claims. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989), made clear that the four-year period begins to run not, as in ordinary fraud actions, from the date a plaintiff discovered or should have discovered the "bad acts" causing him injury, but from the date a plaintiff discovers or should have discovered the specific injury itself. 859 F.2d at 1103. "[A] plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless when the RICO violation causing such injury occurred." *Id.* This rule of accrual flows logically from civil RICO's standing criterion, under which only persons "injured in [their] business or property by reason of a violation of section 1962" can bring a civil RICO action. *Id.* at 1102. "Until such injury occurs, there is no right to sue for damages ... and until there is a right to

sue ..., a civil RICO action cannot be held to have accrued." *Id.*

■ To say that RICO injury triggers the running of the four-year limitations period does not mean, however, that a plaintiff's discovery of his RICO injury, be it actual or constructive, is a sufficient prerequisite of accrual. Rather, in the wake of *Bankers Trust,* it is only a necessary prerequisite of accrual. A plaintiff must obviously still have, in addition to knowledge of his injury, actual or constructive knowledge of the "bad acts" causing the injury in order for the limitations period to accrue. Were it otherwise, suit would be foreclosed to injured parties who through no fault of their own had no reason to suspect that their financial setbacks were caused by violations of RICO. *Accord Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Secur. Corp.,* No. 91–2050, 1992 WL 204374, at *4–*5 (S.D.N.Y. Aug. 11, 1992); *Amendolare v. Schenkers Int'l Forwarders, Inc.,* No. CV–87–3023, 1989 U.S. Dist. LEXIS 17215, at *20 (E.D.N.Y. Dec. 17, 1989); *Long Island Lighting Co. v. General Elec. Co.,* 712 F.Supp. 292, 302 (E.D.N.Y. 1989).[3]

Accordingly, to assess defendants' statute of limitations defense in this case, we must inquire into two things: when did plaintiffs have actual or constructive notice of the alleged fraud, and when did plaintiffs have actual or constructive notice of their claimed injuries. For plaintiffs' RICO claims to be time-barred, plaintiffs must have learned of both the fraud and the injuries flowing from the fraud prior to February 8, 1989—the date that is exactly four years prior to the commencement of their lawsuit. Actual or constructive discovery of either the fraud or

---

**3.** In this regard, it is important to bear in mind that *Bankers Trust* did not set forth a more stringent statute of limitations framework for civil RICO claimants, but a more generous framework: the plaintiff in that case had known six years prior to bringing suit that the defendants had perpetrated fraud against it; the court nonetheless held that the limitations period on one type of injury claimed by the plaintiff had not yet even begun to accrue because the damages flowing from that injury, and thus the injury itself, were speculative. 859 F.2d at 1106. Cases decided after *Bankers Trust* have stressed that civil RICO plaintiffs enjoy a dispensation of time in which to bring suit which is unavailable to plain-

tiffs alleging simple fraud. *See, e.g., Cruden v. Bank of New York,* 957 F.2d 961, 977 (2d Cir. 1992) ("Unlike defendants' fraudulent actions which gave rise to claims for relief under theories of common law fraud ... defendants' RICO violations did not give rise to a claim under § 1964(c) until those violations resulted in an injury to plaintiffs' business or property...."); *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 625 (S.D.N.Y.1990) (although plaintiffs knew of defendants' securities fraud more than four years prior to bringing suit, their RICO claim was not time-barred because they only learned of their injury from the fraud eighteen months prior to bringing suit).

the injury on or after February 8, 1989 would mean, in the eyes of the law, that plaintiffs were not in a position to bring their lawsuit prior to that date, and that their RICO claims are timely.

Before proceeding to this two-part inquiry, we would make two additional points. The first is that questions regarding actual or constructive notice of facts that start the running of the limitations period usually depend for their answers on inferences that are drawn from the facts of each particular case and that are similar "to the type of inferences that must be drawn in determining intent and good faith...." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir.1979). What this means in practice is that *per se* rules of actual or inquiry notice— such as a rule that notices of disallowances from the IRS are always enough to put an investor on notice of fraud in the marketing and management of his tax-shelter investment—are not very helpful. Sometimes IRS disallowance notices will convey the information necessary to provide notice, sometimes they will not—it all depends on the content of the notice, the nature of the loss, and the nature of the fraud.

The second point relates to the date of the occurrence of one's RICO injury. *Bankers Trust* held that an injury occurs for statute of limitations purposes only when the damages have become definite and provable, rather than conjectural. "[R]efusal to award damages as too speculative is equivalent to holding that no cause of action has yet accrued. When damages do become definite, a claim will accrue, and plaintiff will have four years to bring an action for recovery." 859 F.2d at 1106 (citations omitted). Contrary to the suggestions of the defendants, we do not read the recent Second Circuit decision in *Long Island Lighting Co. v. Imo,* 6 F.3d 876 (2d Cir.1993), as altering or even refining this decisional rule. In *Imo,* the plaintiff had constructive knowledge of the fact that it had been sold faulty generators no later than 1977; one of the generators failed in 1983; plaintiff brought suit against the manufacturer of the generators in 1985. The Court of Appeals, relying on *Bankers Trust,* held that plaintiff's RICO claims were time-barred be-cause plaintiff "should have known in 1977 that [the defendant] had delivered defective Generators ... [and plaintiff's] injury was not in any sense speculative at that juncture...." 6 F.3d at 887. In our view, this holding stands only for the unremarkable proposition that a party to a commercial venture can be injured not only when his purchase actually fails in the field but also when he learns that he has received something less than what he paid for. The holding does not stand, as defendants suggest, for the proposition that one's injury need not be ascertainable or quantifiable; nor does it stand for the proposition that "injury" is co-extensive with knowledge of "bad acts." We will therefore analyze the question of when plaintiffs' RICO injuries occurred in this case on the basis of the analysis of *Bankers Trust.*

*Notice of Injury.* As noted above, plaintiffs claim to have suffered three types of injury from defendants' fraud: liability to federal, state and/or local tax authorities; expenses incurred in defending themselves against challenges to their tax filings; and the depletion of the financial base of the tax-shelter investments themselves.

As regards the first alleged injury, defendants have submitted evidence showing that as early as 1985 the IRS was examining the books of the limited partnerships and finding grounds to challenge the declarations of income and losses contained in them. *See* Exh. D to the Affidavit of Jon Edelman, dated November 27, 1992 ("Edelman Aff."). Defendants have also submitted evidence showing that as early as 1985, the IRS had preliminarily decided to disallow certain income and expense items reported by the partners in connection with one of the limited partnerships, *see* Exh. J to the Edelman Aff., and a general partnership that served as the agent of the limited partnerships in trades with third parties, *see id.;* that by 1986 the IRS had audited and determined to disallow certain reported items on the books of an additional partnership, *see* Exh. H to the Edelman Aff.; that by 1986 New York State had begun to issue deficiency notices to seven of the limited partnerships, Exh. F to the Edelman Aff.; that the IRS's pattern of audit and disallowance of partnership income

and expense items continued into 1987 and 1988, *see* Exhs. K, L to the Edelman Aff.; Exh. B to the Affidavit of Barry Lyman, dated September 29, 1994; and finally, that by late December 1987, the IRS and counsel for all of the partners of all of the limited partnerships had worked out a global settlement, the terms of which fixed the allowable losses and reportable gains for all of the partnerships and the way in which interest penalties would be calculated, Exh. F to the Affidavit of Allan Lazaroff, dated January 28, 1994 ("Lazaroff Aff."), at 26–27, 48–50; Transcript of Trial Proceedings, *United States v. Manko*, 979 F.2d 900 ("Manko Trial Transcript"), at 5189–90 (testimony of Barbara Kaplan). Through a letter from counsel to the IRS dated January 15, 1988, roughly two hundred partners expressed their intention to accept the terms of this settlement. Exh. M to the Edelman Aff; Exh. F to the Lazaroff Aff. at 43. On February 25, 1988, counsel for the partners and the IRS informed the tax court that a settlement had been reached. Exh. F to the Lazaroff Aff. at 50.[4]

All of this evidence indicates that plaintiffs' tax-related injuries occurred prior to February 8, 1989, and that plaintiffs knew of their extent. The very disallowances of which plaintiffs complain were made by the IRS over the course of the years 1985–88, and agreement on the formula by which the partners' tax deficiencies would be computed was reached by the end of 1987. A number of partners accepted the terms of the agreement in January 1988. By January 1988, then, all of the partners—plaintiffs included—knew that they had incurred tax-related expenses of a provable amount. And it was the partners' obligation to pay those expenses, not the actual payment as such, that counted as an economic injury for purposes of the accrual of RICO's statute of limitations. *See Bankers Trust,* 859 F.2d at 1105 (RICO plaintiff suffers injury as to each expense when he becomes obligated to pay that expense, not at some later date when he actually makes payment).

Plaintiffs do not dispute that the IRS began to scrutinize and disallow items on their tax returns well before February 8, 1989. They argue, however, that their tax-related injuries did not materialize until sometime after February 8, 1989 because the global settlement agreement with the IRS was not finalized until December 1989, when certain issues pertaining to its implementation were resolved, and because it was only after December 1989 that individual partners signed binding closing agreements with the IRS.[5] Plaintiffs add that the IRS would not issue final notices of disallowance to any of the partners during the pendency of the criminal investigation and prosecution of two of the ringleaders of the tax shelter investment scheme, Bernhard Manko and Jon Edelman. Affidavit of Alan J. Dlugash, dated December 29, 1993 ("Dlugash Aff."), ¶ 24. Manko and Edelman were indicted for tax fraud on February 8, 1989 and convicted on February 4, 1991.

We do not find plaintiffs' arguments convincing. To begin with, they rest tacitly (and erroneously) on the premise that we should gauge the actuality of an economic injury for statute of limitations purposes by the same standards we use to determine whether a binding contract has been executed. It often matters in the law of contracts, for example, whether the parties to an agreement have reduced their agreement to a signed writing. But the fact of a signed writing has no necessary bearing on the issue of the accrual date of a limitations period.

---

4. According to counsel for the partners, the readjustment formula agreed to by the IRS and the partners was as follows:

The basic terms of the settlement were that 20 percent of the losses claimed by the Petitioners [the partners] would be allowed, and 20 percent of gains reported would remain, 80 percent of the losses and the gains would be disallowed, or in the alternative, if it was more favorable to the Petitioner, the Petitioner could elect a cash plus 15 percent offer.

Exh. F to the Lazaroff Aff. at 49–50.

5. A closing agreement is

a written agreement between the taxpayer and the Internal Revenue Service which conclusively settles the tax liability of the taxpayer. Such an agreement is a determination conclusive on both the taxpayer and the Internal Revenue Service unless fraud or misrepresentation as to a material fact is demonstrated.

Affidavit of Elana L. Danzer, dated December 29, 1993 ("Danzer Aff."), ¶ 5.

The fact that any one of the plaintiffs herein may have been within his contractual rights, before signing a closing agreement, to walk away from a settlement with the IRS on the terms reached in December 1987 does not mean that plaintiffs were incapable of quantifying their economic losses for purposes of prosecuting a civil RICO lawsuit. Knowledge of an ascertainable economic injury, not possession of an enforceable action at common law, is what *Bankers Trust* requires for purposes of notice.

■ Second, the fact that problems relating to the implementation of the global settlement agreement remained outstanding until December 1989 does not mean that plaintiffs' tax-related injuries had yet to occur. Only one of the two implementation problems identified by plaintiffs would arguably have had an impact on the amount of a given partner's tax liability, namely, the question of whether the IRS would allow the partners to net the interest due on refunds owed to them against the interest on their deficiencies. Whatever the sum of money that hung in the balance as a result of this implementation issue,[6] it did not render plaintiffs' injuries incalculable. *Bankers Trust* does not say that a potential plaintiff must be able to calculate his loss down to the last penny before his RICO injury can be said to exist; all that is required is that the injury not be "speculative." 859 F.2d at 1106. As a result of the December 1987 accord with the IRS, plaintiffs' injuries were ascertainable; indeed, they had in hand an agreed-upon formula for calculating their tax arrears. The only question remaining was how to minimize their losses by getting the IRS to exercise its discretion and give them a "good deal" on the mechanics of their deficiency payments.[7]

Third, plaintiffs' claim that the IRS refused to enter into definitive settlements with the partners until the prosecutions of Manko and Edelman had run their course is belied by the fact that at least one of the partners signed a closing agreement with the IRS in June 1989, well before the trial and convictions of these two men. *See* Danzer Aff. ¶ 5. The claim is also at odds with the concession plaintiffs made at oral argument that, for purposes of these motions, they were put on notice of their fraud claims on February 8, 1989, the day the Manko/Edelman indictment came down. *See* Transcript of Oral Argument, dated January 26, 1995, at 35.

We conclude that plaintiffs' tax-related injuries occurred prior to February 8, 1989, and that plaintiffs had actual knowledge of those injuries prior to that date.

■ We reach the same conclusion with regard to the two other types of claimed injury. Plaintiffs clearly incurred expenses in defending their interests from challenge by the tax authorities prior to February 8, 1989. Any expenses incurred after February 8, 1989 would amount only to further damages, not to a new, independent injury. *See Bankers Trust*, 859 F.2d at 1103 ("[W]here the plaintiff has already suffered injury and will continue to suffer that *same* injury in the future, an award of past and future damages may be entirely appropriate, subject of course to the normal standards governing such awards.") (emphasis in original). The losses associated with the depletion of the money invested in the trading accounts and limited partnerships and the lost opportunity to earn a profit occurred, according to the Amended Complaint, every time defendants paid themselves trading commissions and incentive compensation, every time they paid bogus fees to the third-party trading counterpart of the investment partnerships, and every time the operating expenses of the trading accounts and partnerships were

---

6. Tax counsel for the partners characterized the interest issue as follows:

> There was also an issue on [sic] off-setting interest costs against interest due to taxpayers on refunds. That was a mechanical issue, it was really not a part of the settlement but it was an item that was still under discussion.

Manko Trial Transcript at 5192 (testimony of Barbara Kaplan).

7. One of the petitioners before the tax court—Jon Edelman—did not feel that a resolution of the two implementation issues was worth the cost of further delay in effecting a final settlement, for he advised the IRS on October 13, 1989 that he wished to accept an earlier-proposed closing agreement that did not resolve the implementation issues favorably to the taxpayers. *See* Exh. N to the Edelman Aff.; Manko Trial Transcript at 5246 (testimony of John S. Nolan).

wasted on the bogus trading activity. Because plaintiffs maintained their investments in the trading accounts only until 1981, Am. Compl. ¶ 3, and because plaintiffs do not allege any trading on the part of the limited partnerships beyond 1983, *see* Am.Compl. ¶ 76, the injuries to the integrity and profitability of their investments must be deemed to have occurred no later than the end of 1983. Plaintiffs have not alleged when they first learned of these losses, and there is nothing in the summary judgment record to counter defendants' contention that they learned of them at or around the same time they learned of the disallowances and their deficiency liabilities. It may be concluded, then, that plaintiffs had notice of this third type of injury prior to February 8, 1989.

Having determined as a matter of law that plaintiffs had notice of each of their injuries prior to February 8, 1989, we next consider when they first had notice of the alleged fraud.

*Notice of Fraud.* Defendants argue that plaintiffs had actual notice, or at the very least inquiry notice, of the alleged fraud well before February 8, 1989.[8] In particular, defendants point to a series of communications from the management of the partnerships to the limited partners over the course of the 1980's, which they claim unequivocally conveyed to the partners the probability that they were being defrauded. Plaintiffs claim that the earliest possible date they learned of the fraud was February 8, 1989, the day the Manko/Edelman indictment came down.

■ It is clear that tax shelters can be risky ventures for reasons wholly unrelated to fraud. As Judge Stanton pointed out in *Dayton Monetary Assocs.*, 1992 WL 204374, at *4, "[t]here are many reasons, other than fraud on the part of [a tax shelter's] managers and trading partners, for an investment in a tax shelter limited partnership to become worthless and for its associated tax deductions to be disallowed by the IRS." One common reason, litigated in case after

case before the tax courts, is that the tax authorities simply disagree with the taxpayer that a given transaction falls within the meaning of one of the tax code's terms of art, such as "income" or "loss." This potential for disagreement over the merits of a given transaction for tax purposes arises out of the so-called "sham-in-substance" doctrine, which requires courts and the tax authorities

> to look beyond the form of a transaction and to determine whether its substance is of such a nature that expenses or losses incurred in connection with it are deductible under an applicable section of the Internal Revenue Code. If a transaction's form complies with the Code's requirements for deductibility, but the transaction lacks the … economic substance that form represents, then expenses or losses incurred in connection with the transaction are not deductible.

*Kirchman v. Commissioner of Internal Revenue*, 862 F.2d 1486, 1490 (11th Cir.1989).

Of course, there is always the possibility that the tax authorities will challenge a reported item, not because they dispute the taxpayer's characterization of the underlying transaction for tax purposes, but because the transaction itself is not what the taxpayer represents it to be. It is one thing, for example, for the IRS to say that an "option straddle transaction," involving prerogatives to buy and sell commodities, was not sufficiently profit-motivated to merit the claimed tax treatment. It is another thing for the IRS to say that the claimed sales and purchases of commodities cannot be recognized because they never in fact occurred. Things being other than what they are claimed to be is not a matter of differing interpretations; it is the essence of fraud.

In our view, the notice-of-fraud issue in this case turns on this distinction between sham-in-substance and sham-in-fact. It is undisputed that the limited partners were notified early on that the IRS might challenge the deductions on losses claimed by the

---

8. "[P]laintiffs had a duty to become aware of their injury—or at least to investigate the circumstances—once they were placed on inquiry notice, which occurred no later than 1986. 1986, therefore (and probably even earlier), is when the statute of limitations began to run on their claims." Memorandum of Law in Support of Defendant Bernhard F. Manko's Motion to Dismiss Complaint at 18.

partnerships. The prospectuses promoting the partnerships warned that:

> The IRS has announced its intention to increase its emphasis on tax shelter partnership audits. Partnerships engaging in spread or straddle transactions are of particular interest to the IRS.

> The IRS has indicated to the Managing Partners that it is examining the 1978 tax returns of two partnerships with which the Managing Partners are affiliated as general partners or consultants.... [P]rospective investors should note that the business activities of the two entities being examined by the IRS are substantially similar to the proposed business activities of the Partnership.

Exh. 9 to the Affidavit of Claude M. Tusk, dated October 29, 1993, at 38. The question is not whether the limited partners knew of the risk that the trading activity in which they had invested would fail to achieve the tax advantages they hoped for; they did know or are presumed to have known this. Rather, the question is whether the limited partners knew of the risk that the trading activity itself would not occur as promised by the promoters and managers of the limited partnerships. We do not believe that we can say, as a matter of law, that they were so apprised.

In March 1984, the management of the partnerships notified all of the limited partners that the IRS was questioning the substance of certain transactions similar to the ones engaged in by the partnerships. Exh. C to the Edelman Aff. The notification suggested that the threat to the tax positions of the partnerships arose as a result of rapid changes in the tax laws and tax regulations and the interpretation given them by the IRS. *Id.* In June 1985, the management of the partnerships notified all of the limited partners that the IRS had proposed adjustments to the partnerships' tax returns. Exh. D to the Edelman Aff. The notification stated that the proposed adjustments were based primarily on *Fox v. Commissioner,* 82 T.C. 1001, 1023, 1984 WL 15588 (1984), a tax court opinion holding that a deferral scheme involving options transactions was insufficiently motivated by a desire for economic profit to generate recognizable losses. There was no allegation in *Fox* that the transactions at issue did not occur as claimed; the opinion even conceded that all but one of the transactions had some potential for profit after commissions. *Id.* at 1021.

In our view, neither one of these correspondences to the partners need be read as communicating circumstances suggesting the probability of fraud. They more readily suggest IRS concern with the tax treatment to be accorded trades which were in fact transacted than challenges to trades which fraudulently never took place.

In April 1986, all of the limited partners received a status report from Saltzman & Holloran, a law firm that had been retained by the management of the partnerships to defend the partnerships against the IRS's inquiries. Saltzman & Holloran advised that the IRS's basis for disallowing losses on certain option transactions, and interest expenses on certain repo transactions, was that the transactions had not been engaged in primarily for profit within the meaning of the Internal Revenue Code. In a passage strongly relied upon by defendants, Saltzman & Holloran then advised the partners that

> [t]he other stated ground for disallowance of both the options and repo transactions is the allegation that the transactions did not occur as claimed, had no economic substance and were prearranged.... [W]e will demonstrate from the books and records of the partnerships that the transactions occurred as claimed and that they were not prearranged or economically irrational.. The partnerships purchased and sold government securities and entered into repo transactions with independent third parties....

Exh. F. to the Edelman Aff. (Memorandum from Barbara T. Kaplan to Jon Edelman) at 3, 5. The partners of one of the limited partnerships—Conarbco—also received in April 1986 a letter from Saltzman & Holloran advising of the IRS's charge that the transactions engaged in by Conarbco did not actually occur and were not at arm's length with independent third parties. Exh. H to the Edelman Aff. (Memorandum from Barbara T. Kaplan to Jon J. Edelman) at 1–2. At-

tached to the letter was a copy of the IRS Summary Report on Conarbco for the tax years 1982 and 1983. In the Summary Report, dated January 17, 1986, the IRS concluded that "[t]he information received does not establish that the transactions [of Conarbco] actually occurred." Other IRS Summary Reports on some of the other limited partnerships, completed well before February, 1989, reached similar conclusions.[9]

Defendants argue that the status reports from Saltzman & Holloran, coupled with the Summary Reports issued by the IRS and relayed to the limited partners, put plaintiffs on notice of the fraud. And they have a point: these reports depict the partnerships' transactions as not merely preconceived or prearranged with an eye to tax advantages, but as fictitious. They depict "shams-in-fact"—"typing" not "trading"—and on their face would seem to establish inquiry notice of the fraud to plaintiffs well before February 1989.

■ Plaintiffs, however, have an explanation for these reports, and for why they did not trigger inquiry notice. Plaintiffs first point out, rightly enough, that the transactions analyzed in these reports were transactions between the partnerships, on the one hand, and the entities established by defendants to serve as the partnerships' agents in trades with third parties—Government Clearing Company ("GCC") and Government Securities Trading Corporation ("GSTC")—on the other hand. Plaintiffs then contend that GCC and GSTC were intended and known to be entities controlled by the partnerships, and that the trading between the partnerships and GCC/GSTC was intended to be managed, rather than at arm's length. According to plaintiffs' expert Alan Dlugash:

GCC and GSTC were, and were openly intended to be, related entities created by [the management of the partnerships] to channel the trading activities of the investment partnerships with "the street." In other words, rather than arrange for trades to take place between each of the fourteen or so investment partnerships (which were separately constituted at different times and through different promoters) and third-party entities, the process was simplified by conducting master trades between GCC and GSTC and an outside trading house, and then breaking the effect of these trades down through "mirror transactions" allocated among the investment partnerships. So long as the master trades of GCC or GSTC with "the street" were at arm's length and legitimate, the "mirror transactions" of GCC or GSTC with the investment partnerships were irrelevant.

Dlugash Aff. ¶ 20.

Thus, say plaintiffs, knowledge of the fact that the IRS was challenging as fictitious the trading activity between the partnerships and GCC/GSTC did not entail knowledge of the fraud that is at the heart of the Amended Complaint—namely, the fraudulent trading activity between GCC/GSTC and a third-party trading counterpart which generated billions of dollars in bogus interest expenses.

We find this explanation plausible, if not air-tight. It goes some way toward explaining how the IRS could have found the partnerships not to have owned or traded in the amount of securities listed on their books without also implicating the partnerships in a scheme of fraudulent trading. More importantly, defendants have not tried to rebut the explanation with a showing, or even an alle-

---

**9.** *See, e.g.,* Exh. I to the Edelman Aff. at 3 (Sectra Limited Partnership); Exh. J to the Edelman Aff. at 10 (Midopco Limited Partnership) ("[I]t appears that all the interest that Midopco purports to have paid or received was never paid or received. They appear to have been merely a bookkeeping entry made on Midopco's books. Further, beyond a paper confirmation from another, related, partnership (Government Clearing Company) there is no evidence whatsoever that these securities ever were owned by Midopco."); Exh. J to the Edelman Aff. at 4 (Government Clearing Company) ("It is important to note that

in this transaction and in all other transactions there is no evidence to verify that GCC ever owned the securities in which these trades were purported to have been made. Also[,] actual money changed hands only on rare occassions [sic]. Almost all transactions were merely a debit or credit to the account balance of GCC."); *id.* at 7 ("Another important point is that the millions of dollars in interest that GCC purports to have paid or received was never actually paid[;] it was merely a bookkeeping entry made on the books of GCC....").

gation, that there was no such tacit understanding among the partners that the partnerships and GCC/GSTC were all in the same family.

On the basis of the foregoing, we conclude that there are genuine issues of material fact regarding the meaning and significance of the information conveyed to plaintiffs by the management of the limited partnerships (and by Saltzman & Holloran) over the course of the 1980's. We cannot conclude as a matter of law that the information was of such an unambiguous nature as to put plaintiffs on notice of the probability that they were defrauded. And, because there appears to be no other basis for finding actual or inquiry notice of the fraud prior to the February 8, 1989 indictment, we accept at this stage of the litigation plaintiffs' claim that they first learned of the fraud on that date. We accordingly hold that for purposes of these motions, plaintiffs' RICO claims did not accrue until February 8, 1989, and thus that they are timely.[10]

Finally, we may quickly respond to two points raised by defendants in connection with their RICO limitations defense.

■ First, defendants argue that plaintiffs have failed to successfully allege a RICO claim because they have failed to allege timely securities fraud claims as predicate acts to support it. We disagree. As Judge Keenan recently noted in *Toto v. McMahan, Brafman, Morgan & Co.*, No. 93 Civ. 5894, 1995 WL 46691, at *5–*6 (S.D.N.Y. Feb. 7, 1995), to hold that an untimely securities fraud predicate renders a RICO action untimely would subvert the four-year statute of limitations applicable to a RICO action. It would also effectively nullify the rule that it is the injury, rather than the racketeering activity itself, which triggers civil RICO's statute of limitations. Defendants' reliance on *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), is misplaced. *Lampf* held only that a one year-three year limitations period governs securities fraud actions; it did not even address whether securities

fraud claims brought after the expiration of the three-year period of repose are substantively defective for purposes of serving as predicates for claims brought under other federal statutes.

Second, defendants contend that even if the original complaint in this action was timely filed (it was filed on February 8, 1993), the thirty-six plaintiffs who were added in the Amended Complaint which was filed several months after the original complaint should not get the benefit of the earlier filing. In other words, the claims of the "latecomer plaintiffs" should not be deemed to relate back to the claims of the original plaintiffs. Defendant Palisades Planning Corp., which was not party to the original complaint, appears also to argue that none of the plaintiffs is entitled to rely on the filing date of the original complaint with respect to it.

■ Again, we disagree. The Second Circuit's recent decision in *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19 (2d Cir.1994), indicates that late-filed claims properly relate back to timely-filed claims as long as the amendment does not produce an unfair surprise to the defendant. Given that the added plaintiffs' claims in this case are identical to those of the original plaintiffs, defendants have not been prejudiced in their ability to mount a defense. The claims of the latecomer plaintiffs are therefore timely. Palisades' argument fails for the simple reason that Barry Lyman, one of the original defendants, is alleged to have been one of its principals and a majority stockholder. Am. Compl. ¶ 11. *See Koal Indus. Corp. v. Asland, S.A.*, 808 F.Supp. 1143, 1157 (S.D.N.Y. 1992) ("plaintiffs have been allowed to add or substitute parties where there is an extremely close corporate or other relationship between the original and the added defendant") (quoting 3 James W. Moore, *Moore's Fed. Practice*, ¶ 15.08[5] (1992)).

### 2. State Law Fraud

The New York statute of limitations for fraud is six years from the date of the com-

---

**10.** Our determination that plaintiffs' RICO claims accrued on February 8, 1989 for purposes of these motions makes it unnecessary to assess

at this time the merits of plaintiffs' allegations of fraudulent concealment.

mission of the fraud, see N.Y.Civ.Prac.Law & R. ("NYCPLR") § 213(8) (McKinney 1990), or two years from the date the plaintiff discovered, or should have discovered, the fraud, whichever is longer, id. § 203(f). Six years from the date of plaintiffs' last investments in the tax shelters is 1989, see Am. Compl. ¶¶ 3, 4; two years from the date plaintiffs concede they learned of their fraud claims for purpose of these motions (February 8, 1989) is February 8, 1991. Given that plaintiffs filed their original complaint in this action on February 8, 1993, their state law fraud claims are time-barred.

Of the moving defendants, only defendants Bryant, Carlock, Devlin, and Goudreau rely exclusively on the statute of limitations defenses; the other moving defendants defend against the action on alternative grounds. We will now proceed to address the defenses that are particular to individual defendants.

### B. Defendant Manko

Bernhard Manko ("Manko") moves to dismiss the Amended Complaint on grounds of improper service of process. Plaintiffs respond by moving for entry of a default judgment against Manko for failure to file a timely answer. Because these motions are interrelated, we will address them in tandem.

As noted, plaintiffs filed their original complaint in this case on February 8, 1993. Under the Federal Rules of Civil Procedure, they had 120 days, or until June 8, 1993, to effect service of process. Fed.R.Civ.P. 4(j).[11] Plaintiffs claim that on June 1, 1993, a process server in their employ served a copy of the summons and complaint on the doorman of an apartment building in which Manko was believed to reside, and that on the following day, the process server mailed a copy of the summons and complaint to Manko at the address of this building (425 East 63rd Street, New York, New York (hereinafter "425 E. 63rd")). Manko did not make an appearance in the action during the twenty days following this substitute service, as required by Fed.R.Civ.P. 12(a). Indeed, he claims he could not have made an appearance

because he never received the complaint in this case "from any doorman or anyone else at the building at 63rd Street in June 1993 or at any other time." Affidavit of Bernhard F. Manko, dated January 31, 1994, ¶ 3. Manko does concede, however, that at some unspecified time, after the deadline for filing an answer had passed, he received the *mailed* copies of the summons and complaint. See id. ¶ 4 ("I am aware that a copy of the complaint in this case was mailed to me in an envelope ... at 425 East 63rd Street.... I did not receive anything further in this action until I was handed a summons and complaint on September 30, 1993 in a Florida prison."); Defendant Bernhard F. Manko's Memorandum of Law in Reply to Plaintiffs' Opposition to his Motion to Dismiss and in Opposition to Plaintiffs' Cross–Motion for Default Judgment ("Def.'s Reply Mem.") at 8 n. 9, 15.

On July 30, 1993, plaintiffs wrote a letter to the Court requesting sixty additional days in which to serve five defendants, of whom Manko was one, who plaintiffs claimed had already been served through substitute means but had yet to appear in the action. Plaintiffs made this request because they feared that:

> Given these defendants' failure to appear after substitute service ... they will contend that service of process upon them was not proper.... Plaintiffs do not hereby concede or even suggest that the prior service on these five was in any way defective, but in an abundance of caution now seek to reserve this option.

Plaintiffs' Letter to the Court, dated July, 30, 1993, at 2. The Court granted plaintiffs' request for a sixty-day extension. On September 30, 1993, plaintiffs personally served Manko in prison in Florida. On November 1, 1993, the last day of the thirty-day time limit for answering an out-of-state summons and complaint, see Fed.R.Civ.P. 4(e), 12(a); NYCPLR §§ 313, 320(a), Manko served the instant motion.

Manko contends that the substitute service attempted by plaintiffs on June 1–2, 1993 in New York City was defective in several re-

---

11. The events relevant to the service-of-process issue in this case took place before the effective date of the most recent amendments to the Fed-eral Rules of Civil Procedure (December 1, 1993). We accordingly cite to the 1993 edition of the Federal Rules.

spects. Because the substitute service was defective, he says, plaintiffs' July 1993 request for an extension of time in which to reserve Manko and others was based on an erroneous assumption of a prior, effective service; it was therefore improperly granted and cannot now serve as a basis for claiming that service was timely made.

Plaintiffs argue that the substitute service effected in June 1993 was valid under the terms of Rule 4(d)(1) of the Federal Rules of Civil Procedure, and that Manko defaulted in both failing to answer within twenty days of the June service and failing to answer within twenty days of the September service.

The first issue before us is the validity of the substitute service attempted by plaintiffs on June 1, 1993.[12] Rule 4(d)(1) permits service to be made by leaving copies of the summons and complaint at "the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein...." Three questions arise out of this standard: (1) did 425 E. 63rd serve as Manko's "dwelling house" or "usual place of abode"?; (2) was the doorman with whom the summons and complaint were left a person of "suitable age and discretion"?; and (3) was it necessary that the doorman actually "reside" at 425 E. 63rd?

We believe we can answer the first question on the basis of facts that the parties either concede or at the very least do not contest. First, Manko's former attorney, Earl Nemser, states that since at least 1979, Manko stayed at 425 E. 63rd whenever he was in New York City (other than when he stayed at a summer rental on Long Island). Affidavit of Earl Nemser, dated October 27, 1993, ¶ 4. Second, Robert Manko, a nephew of Manko who owns a share in several apartments at 425 E. 63rd, states that one of the apartments—"Penthouse B"—is frequently used by his relatives and "from time to time by my uncle, Bernhard." Affidavit of Robert Manko, dated February 3, 1994, ¶ 3. Third, we know by way of negative inference from Robert Manko's affidavit that Manko may have been spending "most of his time" in New York City as late as May 1993;[13] and we know from a modification of Manko's bail conditions that he was in New York City in mid-June, 1993. Exh. A to Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Cross–Motion for a Default Judgment Against Defendant Bernhard F. Manko. Fourth, Eugene Healy, the doorman of 425 E. 63rd who claims to have refused service on June 1, 1993, assumes in his affidavit to the Court that Manko was a resident of 425 E. 63rd during that time period.[14] Fifth,

**12.** It is possible that plaintiffs were trying to comply with the "nail and mail" provision of NYCPLR § 308(2) when they had their process server both personally deliver and mail copies of the summons and complaint to 425 E. 63rd. State law methods of serving process are irrelevant, however, since Rule 4(d)(1) contains a federal standard of service which governs service upon individuals who are not infants or incompetents. Because this federal standard contains no mailing requirement, we will consider only whether the steps the process server took on June 1, 1993 to effect service (*i.e.*, personal delivery of the legal papers to 425 E. 63rd) satisfied Rule 4(d)(1).

**13.** "In June 1993 Bernhard maintained his residence in Florida. To the best of my recollection, he was not visiting me or staying at [Penthouse B], or any other apartment [at 425 E. 63rd] on June 1, 1993. In fact, I recall that Bernhard was spending most of his time in Florida from as early as May 1993 through his entering into prison." Affidavit of Robert Manko ¶¶ 5, 6.

**14.** For example, Healy states that

Mr. Perricone [the process server] came up to me and said "Gene, I have papers here for Mr. Manko." I did not know how he knew my name but I assumed that the night doorman had told him. I informed him that I was not instructed or authorized to accept papers for Mr. Manko. He threw them on the desk in the lobby and left.

I do not know what happened to those papers and am not aware whether or not Mr. Manko ever received them.

It has always been my practice not to accept legal papers for tenants in my building, unless they previously instruct me to do so.

. . . .

Additionally, Mr. Perricone's affidavit represents that he asked a doorman to call Mr. Manko's apartment on that morning. Contrary to the implication in Mr. Perricone's supplemental affidavit, if he made that request it must have been of the night doorman and not of me. I did not call Mr. Manko's apartment for Mr. Perricone and he never asked me to do so.

Affidavit of Eugene Healy, dated January 17, 1994, ¶¶ 4–6, 8.

Manko was listed under the address "425 E 63" in the Manhattan Telephone directory for the years 1985 through 1991. Reply Affidavit of Lyn M. Montgomery in Support of Cross–Motion for Default Judgment, dated February 25, 1994, ¶ 6 & Exh. A. Sixth, Manko currently has a valid New York State driver's license issued to him under the address "425 E 63 St, New York City NY 10021." The license was issued effective February 1992 and is due to expire in February 1996. Reply Affidavit of Thomas M. Tolan in Support of Cross–Motion for Default Judgment, dated February 23, 1994, ¶¶ 3–4 & Exh. A.

On the other hand, Manko has no ownership interest in Penthouse B; he does not pay rent for the apartment; and for the past 14 years he has maintained a residence in Florida at which he began to spend "most of his time" in May 1993. Affidavit of Robert Manko ¶¶ 4, 6.

Having considered all of the foregoing facts, we are left with the firm impression that Manko used the apartment known as "Penthouse B" at 425 E. 63rd as his place to stay in New York City, and that he visited New York City with considerable frequency and regularity during the 1980's and 1990's, all the way up to the point of his imprisonment in Florida in September 1993. In our view, this is enough to support a finding that 425 E. 63rd served as a "dwelling place" or "usual place of abode" for Manko in June 1993 for purposes of service of process under Rule 4(d)(1). While it is true that Manko's presence at 425 E. 63rd was episodic rather than constant, his association with 425 E. 63rd was far from haphazard. It was attested to by his own representations, disinterestedly made. And while it is true that Manko had at least one long-standing residence outside of New York City, it cannot be said that the permanence Manko enjoyed at 425 E. 63rd was lessened by the fact that he enjoyed permanence elsewhere. "[I]n a highly

mobile and affluent society, it is unrealistic to interpret Rule 4(d)(1) so that the person to be served has only one dwelling house or usual place of abode at which process may be left." *National Development Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir.) (quoting 4A C. Wright & A. Miller, Federal Practice and Procedure § 1096, at 79–80 (2d ed. 1987)) (holding that defendant, a citizen and domiciliary of Saudi Arabia, was properly served at his apartment complex in New York City despite having spent only thirty-four days of the calendar year there), *cert. denied,* 502 U.S. 968, 112 S.Ct. 440, 116 L.Ed.2d 459 (1991); *see also Palandjian v. Pahlavi,* 586 F.Supp. 671, 676 (D.Mass.1984) (under NYCPLR § 308(2), which contains the same "dwelling place or usual place of abode" standard as Rule 4(d)(1), defendant whose "principal residence" was in France was properly served at her New York City apartment, where she spent approximately four months per year); *Karlin v. Avis,* 326 F.Supp. 1325, 1329–30 (E.D.N.Y.1971) (under NYCPLR § 308(2), defendant, a resident and domiciliary of Michigan, was properly served at his New York City apartment, despite only using it sporadically, in lieu of a hotel room, when he was in New York City); *Pickford v. Kravetz,* 17 Fed.Rules Serv. 4d.121, case 1, at 20 (S.D.N.Y.1952) (hotel where defendant stayed for approximately one week was a "dwelling place" within the meaning of Rule 4(d)(1)).[15]

■ We next consider whether Eugene Healy, the doorman with whom the summons and complaint were left, was a person of "suitable age and discretion." We conclude that he was. There is nothing in the record before us to suggest that the duties of Eugene Healy differed in any way from those of a regular apartment house doorman, *i.e.,* to screen and announce visitors to the building and to accept messages and packages for delivery to the tenants. Because it was this

---

15. Manko argues that *National Development, Palandjian,* and *Karlin* are not persuasive authority because the defendants in those cases either owned or rented the apartment at which they were served. Def.'s Reply Mem. at 9. We disagree. While ownership and lesser property interests, or the lack thereof, may testify to the strength of the connection that an individual has

to a property, they should not be considered conclusive on the issue of notice either way. Absentee owners, for example, can claim ownership, but not actual presence. And adults who occupy a residence either at the largesse of friends or relatives or in exchange for some form of non-monetary consideration can claim presence, but not a property interest.

doorman's job to serve as a link between the outside world and the tenants of 425 E. 63rd, he was an objectively reliable third party with whom to leave legal papers. What has been said of hotel managers and landlords applies equally to doormen:

> Arguably, since hotel managers and landladies normally are under an obligation to transmit all incoming messages and mail to guests and tenants, there appears to be no valid objection to permitting delivery to such persons, at least in terms of questioning the likelihood of notice or fairness to [a] defendant. This obligation to relay information to guests and occupants should be a sufficient basis for distinguishing those cases in which service has been disallowed when left with a resident of a multiple unit dwelling who is not living in defendant's place of abode.

Wright & Miller, *supra*, § 1096, at 82–83. *See also Hartford Fire Ins. Co. v. Perinovic*, 152 F.R.D. 128, 131 (N.D.Ill.1993) (doorman was of "suitable age and discretion" given that he was authorized to accept and sign for all deliveries for the tenants of the building, including legal documents); *F.I. duPont v. Chen*, 41 N.Y.2d 794, 396 N.Y.S.2d 343, 345, 364 N.E.2d 1115, 1117 (N.Y.1977) (interpreting NYCPLR § 308(2)) (same). Moreover, where, as here, the process server is not permitted to proceed to the actual apartment by the doorman or some other employee, *see* Supplemental Affidavit of Raymond Perricone, dated December 21, 1993, ¶ 2, the doorman becomes all the more "suitable" as a repository of the papers because he is in effect the only accessible party.

■ We recognize that it was the doorman's practice in this case not to accept legal papers for tenants of 425 E. 63rd unless he was authorized by them to do so. Healy Aff. ¶ 6. But we do not believe this changes matters. The question is not whether an individual has demonstrated, through instructions given to a third party, that he is willing to be served with legal papers, but whether the third-party occupies a position

the nature of which ensures that substitute service will result in actual service. A different rule would allow potential defendants to evade legal process simply by choosing their living quarters strategically.

■ The third and final question is whether the doorman service attempted here was invalid because Healy himself did not reside at 425 E. 63rd. *See* Healy Aff. ¶ 1. We conclude that the service was valid. In *Pickford v. Kravetz, supra*, the court, finding "nothing in common sense to forbid a single address from being the dwelling place of one person and the 'business residence' of another," construed Rule 4(d)(1)'s phrase "residing therein" to encompass business residences as well as personal residences. The court then concluded that a hotel manager who spent

> all day almost every day in the hotel as a duty and familiar with all of its guests and where and when they can ordinarily be found there, and operating under the obligation of his office to transmit all information to every guest, was precisely the man envisaged as a resident by the rule.

*Kravetz*, 17 Fed.Rules Serv. at 21. We agree with this construction of "residing therein," and see no reason why it would not apply to an apartment building doorman as much as to the manager of a hotel.[16]

We accordingly hold that the June 1993 substitute service on Manko, as effected through Eugene Healy, the doorman of 425 E. 63rd, was valid under Rule 4(d)(1). Because it was valid, plaintiffs' July 30 request for an extension of time in which to re-serve Manko was properly granted. Manko's motion to dismiss the complaint on grounds of improper service is therefore denied.

■ The remaining question is whether default judgment should be entered against Manko. On the one hand is the fact that Manko did not timely answer the summons and complaint that were successfully served on him on June 1, 1993. On the other hand is the fact that plaintiffs asked for and received an extension of time in which to re-

---

16. Courts that have considered this issue in contexts where the defendant received actual notice of the lawsuit have also concluded that Rule 4(d)(1) permits service on non-resident doormen.

*See Churchill v. Barach*, 863 F.Supp. 1266, 1271 (D.Nev.1994); *Perinovic*, 152 F.R.D. at 131 (citing cases).

serve Manko, this time personally, in prison, and that Manko responded in a timely fashion to this second service. While we recognize that plaintiffs sought to re-serve Manko only out of "an abundance of caution" and did not mean to suggest with their request that the first service was in any way defective, we do not think plaintiffs can have it both ways: rely on a court-sanctioned second service to protect themselves from later allegations of improper service, yet urge disregard of the second service after the defendant has timely responded to it. The legal effect of a served summons and complaint simply cannot be turned on and off again according to the particular conveniences of a party. Given that the second service on Manko was valid, and that Manko filed a timely response to it, plaintiffs are not entitled to a default judgment.

## C. Defendants Tese & Sinclair

In their first claim for relief, plaintiffs allege that defendants violated section 1962(c) of 18 U.S.C., which makes it unlawful

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

■ To establish a civil RICO claim for violation of this section, a plaintiff must show that (1) the defendant (2) through the commission of two or more predicate acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly conducts, or participates in the conduct of (6) an enterprise (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Defendants Vincent Tese and James Sinclair contend that the Amended Complaint does not adequately allege elements (2)–(6) with respect to them, and move pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P., to have it dismissed.

The Amended Complaint is sixty-two pages long. It contains detailed factual allegations about the fraudulent trading scheme—how the scheme was marketed, how it was operated, how it was structured, how it was concealed. What's more, the Amended Complaint makes these allegations, not in a vacuum, but against the backdrop of the criminal convictions of two of the defendants in this case for the same acts that form the basis of plaintiffs' civil claims. In light of the Amended Complaint's comprehensiveness and context, there is little reason to suspect that this lawsuit is a "strike suit," brought for the purpose of extracting a "nuisance value" settlement. The Amended Complaint certainly does not deserve Tese and Sinclair's characterization of it as possessing not a "shred of factual detail," and as alleging "in some unspecified way" violations of the federal securities, mail fraud and wire fraud statutes, all for the calculated purpose of catching defendants "within the maw of RICO." Memorandum of Law in Support of the Motion by Vincent Tese and James Sinclair to Dismiss the Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b) and 9(b) and for Rule 11 Sanctions at 9.

That said, Tese and Sinclair's motion to dismiss requires us to focus not so much on the Amended Complaint's overall merit as on the sufficiency of its allegations against particular defendants.

■ As has already been noted, the heart of the Amended Complaint is the allegation that the managing general partners of the partnerships—Bernhard Manko, Jon Edelman, and Robert Bushnell—created the false appearance that the limited partnerships, through GCC and GSTC, engaged in billions of dollars worth of trades in government-backed securities with third-party trading counterparts. In reality, there was only one trading counterpart—T.S.M. Holding Corp. ("TSM")—a corporation set up by Tese and Sinclair in June 1982 and owned by them until October 1982, when they transferred ownership, gratuitously, to defendants Robert Maurus and Charles Genovese. *United States v. Manko*, 979 F.2d at 903–04; Am. Compl. ¶ 39. The Amended Complaint alleges that Tese and Sinclair, both former business associates of Manko, 979 F.2d at 903; Am.Compl. ¶ 80, "encouraged the use of TSM as a counterpart to fictitious and prear-

ranged trades among the investment partnerships, GCC and GSTC," when they "knew, or recklessly disregarded the fact, that Manko and Edelman would use TSM to create bogus tax losses to be passed on to plaintiffs and other investors." Am.Compl. ¶¶ 40, 41, 94(a). The Amended Complaint alleges facts showing that Tese and Sinclair stood to profit from the "loan" of their corporation to Manko and Edelman, Am.Compl. ¶¶ 84, 91, 94(c)-(e); that for the tax years 1982 and 1983, Manko, Edelman and their staff created false trade confirmations for more than $38 billion worth of fraudulent transactions between TSM and GCC/GSTC, Am.Compl. ¶¶ 89–90; and that the financial boon to the partnerships from these bogus transactions with TSM, as reflected in the partnerships' financial statements, attracted new investors and caused old investors to retain their investments, Am.Compl. ¶ 75(b).

We believe that these allegations, in conjunction with some others that we will presently discuss, are enough to state a claim against Tese and Sinclair under § 1962(c).

■ 1. *Enterprise.* To begin with, plaintiffs adequately allege a RICO "enterprise" when they claim that an "association-in-fact" existed among (1) the defendants involved in promoting the discretionary accounts and the limited partnership interests, (2) the defendants involved in the process of actually conducting the fictitious trading activity, and (3) the defendants involved in looting the discretionary accounts and the partnerships. *See* Am.Compl. ¶ 120; 18 U.S.C. § 1961(4) (defining "enterprise" to include "any union or group of individuals associated in fact although not a legal entity"). An "association in fact" may consist of a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). It is proved by evidence "of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* Here, the allegation is that a group of persons, orchestrated by Manko, Edelman, and Bushnell, informally associated over a period of roughly five years for the common, illegal purpose of operating a trading program on a phony basis and thereby garnering substantial financial rewards. *See* Am.Compl. ¶¶ 55–60. The Amended Complaint alleges that defendants attempted to run the illicit enterprise in a variety ways: trading through discretionary accounts, trading through the limited partnerships, trading through GCC, trading through GSTC, trading through so-called "mirror transactions," etc. But the common goal of defrauding the investor/partners and deceiving outside auditors and tax authorities was constant, and it existed independently of the discrete actions taken by the defendants to further it. *See Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. Moreover, although some of the enterprise's members—such as Tese and Sinclair—came on the scene after the enterprise had been formed, and left the scene before the enterprise had ended, Manko, Edelman, and Bushnell are painted as having formed a core group of personnel which lent the enterprise the continuity and unity of purpose indicative of a RICO "enterprise."

■ 2. *Participation.* Plaintiffs have also alleged facts from which it could reasonably be inferred that Tese and Sinclair participated in the conduct of this illicit enterprise. To participate in a RICO enterprise, "some part in directing the enterprise's affairs is required." *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993). A defendant must have participated "in the operation or management of the enterprise itself." *Id.* at ——, 113 S.Ct. at 1172. While this operation-or-management rule is intended to spare from RICO liability true enterprise outsiders (such as outside accounting firms), we do not think it is so narrow as to spare the kind of key, if passive, insiders that Tese and Sinclair are alleged to be. For though Tese and Sinclair did not operate or manage the enterprise in the sense of involving themselves in the day-to-day processing of fraudulent trades and communications with investors and outside auditors, neither were they the sort of unwitting footsoldiers whose liability was at issue in *United States v. Viola,* 35 F.3d 37 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

They allegedly enabled the partnerships to function effectively by providing their own company, TSM, as the partnerships' corporate trading partner. In so doing, they helped determine the enterprise's modus operandi, and can be said to have "managed" its basic structure. Moreover, it is not unreasonable to assume that Tese and Sinclair exercised a degree of control over the enterprise as a whole because of TSM's centrality to the scheme.

The Second Circuit recently upheld a § 1962(c) claim against a defendant whose only alleged participation in a real estate tax shelter was that of allowing his name to be used on a bogus contract and showing up at the closing of the fraudulent property sale. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 515, 521 (2d Cir.1994). In light of this decision, and for the reasons just given, we find little difficulty in concluding that plaintiffs have adequately alleged that Tese and Sinclair participated in the conduct of the RICO enterprise conceived and headed by Manko, Edelman, and Bushnell.

█ 3. *Predicate Acts.* Plaintiffs allege that Tese and Sinclair engaged in three types of predicate acts: aiding and abetting securities fraud,[17] mail fraud, and wire fraud. Am. Compl. ¶¶ 94, 121, 129. Tese and Sinclair argue that plaintiffs have not set forth facts from which it could be inferred that they acted with the intent to commit any acts of fraud, or that they even knew of the existence of the fraudulent tax shelter scheme. They invoke Rule 9(b) of the Federal Rules of Civil Procedure, which provides that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Although Rule 9(b) permits knowledge to be averred generally, the Second Circuit requires that plaintiffs plead a factual basis giving rise to a "strong inference" of fraudulent intent. *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

█ In this case, plaintiffs have pleaded intent on Tese's and Sinclair's part by relying on such conclusory statements as "Upon information and belief, defendants Tese and Sinclair knew of the fraudulent plan and scheme described herein, and were direct participants in or aiders or abettors of such fraudulent scheme," and "Tese and Sinclair knew that Manko and Edelman would be making all the 'trading' decisions for TSM and, therefore, knew that there would be no negotiations and no economic substance or legitimate purpose for such 'trading' and that the 'trades' would be put on solely for the purpose of creating the appearance of legitimate tax losses." Am.Compl. ¶¶ 94, 94(a). However, it is also true that "a common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud," *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), and that plaintiffs have alleged a motive. They plead facts showing that Tese and Sinclair expected that the prearranged fees, disguised as interest expenses, that TSM would receive for the risk-free trading with GCC/GSTC would provide Messrs. Maurus and Genovese with the capital needed to buy one of their investment businesses. *See* Am.Compl. ¶ 94(c)-(e).

█ Moreover, where motive is not apparent, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant...." *Beck,* 820 F.2d at 50. In this regard, plaintiffs have alleged that TSM was an "inactive corporation controlled by Manko and his associates." Am.Compl. ¶ 76. It was

---

17. We do not read the operation-or-management rule enunciated in *Reves* as changing the rule that "[c]ivil RICO liability can be predicated on aiding and abetting the commission of the predicate acts by the primary offender." *Zola v. Gordon,* 685 F.Supp. 354, 375 (S.D.N.Y.1988). Clearly, a person can operate or manage an enterprise and yet, through delegation, avoid directly committing predicate acts.

Although the aiding and abetting allegation here is not stated as clearly as it could be—it emerges through a slight mixing and matching of the numbered paragraphs—a fair reading of the Amended Complaint apprises one of it.

a shelf company Manko "borrowed" from his former associates, Vincent Tese and James Sinclair, with no assets, with no business, with no telephone; it did not have a single employee nor a bank account. It was merely a convenient name to be inserted on defendants' bogus trading tickets.

*Id.* ¶ 80. Further,

[a]t no time did TSM have the resources (cash or otherwise) necessary to provide the financing for the repo transactions [with GCC/GSTC] as purported to be represented by the bogus trading confirmations. The subscribed capital of TSM, which was represented by notes from Maurus and Genovese, was only $200.

*Id.* ¶ 93. In other words, TSM is alleged to have been an empty shell, set up and owned by two persons who took no interest in, and exerted no control over, its affairs.[18] Whether ultimately borne out or not, this allegation paints the picture of a rather atypical corporate existence. And atypicality, at least in business affairs, may circumstantially suggest the possibility of fraud. *See Beck,* 820 F.2d at 50 (plaintiffs adequately pleaded scienter by alleging two sets of "unusual circumstances" surrounding the sale of U.S. collateral).

We accordingly conclude that plaintiffs have adequately pleaded scienter. We resolve other points related to the predicate acts issue as follows:

■■■ On the aiding and abetting charge, we find, first, that plaintiffs have alleged facts sufficient to state a securities law violation by the primary wrongdoers (*i.e.,* Manko, Edelman, and Bushnell). The sale of limited partnership interests is a sale of securities under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); and promises of future action made as consideration for a sale of securities (such as the alleged promises to engage only in transactions with profit-potential) are actionable under Section 10(b). *Id.*[19] Second, we find that plaintiffs have alleged facts going to show that Tese and Sinclair associated with and participated in these primary violations as something they wished to bring about and sought by their actions to make succeed. *See Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (articulating the elements of aiding and abetting a criminal act).[20] One might reasonably infer intent to aid a primary violation from allegations of substantial assistance, and plaintiffs have

---

**18.** This allegation accords with the government's allegation in *United States v. Manko* that "Manko and Edelman appropriated a dormant shell company, TSM Holding Company ('TSMH'), and unilaterally wrote documents to reflect billions of dollars of repos to maturity between TSMH and two clearing brokers controlled by Manko and Edelman...." *United States v. Manko,* 979 F.2d at 902–03. The government presented "a substantial amount of evidence" that from July of 1982 to September of 1982—the period during which Tese and Sinclair owned TSM—"there was no one at TSMH with whom Manko and Edelman could negotiate the deals. Vincent Tese and James Sinclair ... set up TSMH in June of 1982. Neither, however, ever injected any capital into TSMH or used the company in any way." *Id.* at 903.

**19.** Plaintiffs allege that they "invested in the investment partnerships based on written representations made in private placement memoranda for each of the investment partnerships," to the effect that "no transactions would be entered into by the respective partnerships unless there was an opportunity to make an economic profit...." Am.Compl. ¶ 69.

**20.** We use the definition for aiding and abetting criminal acts, not civil acts, because that is the definition relevant to claims brought under civil RICO. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 280–81, 112 S.Ct. 1311, 1324–25, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring); *Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Sec. Corp.,* No. 91 Civ. 2050, 1995 WL 43669, at *4 (S.D.N.Y. Feb. 2, 1995) ("[W]hether one commits 'racketeering activity' depends on whether one is criminally liable for a given act, not on whether one is civilly liable."). The Supreme Court's recent decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), eliminated civil liability for aiding and abetting violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. However, because *Central Bank* did not question the government's right to criminally punish the aiding and abetting of such violations, *see id.* at ——, 114 S.Ct. at 1455, it has no bearing on the question of whether plaintiffs have adequately alleged RICO predicate acts of aiding and abetting securities fraud.

quite clearly alleged that Tese and Sinclair's loan of TSM to Manko, Edelman, and Bushnell aided the latter in the execution of their tax shelter scheme.

 To state a claim of mail fraud, plaintiffs must allege facts going to show "(1) that [Tese and Sinclair] caused the mailing, namely that they must have acted with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended ... and (2) that the mailing was for the purpose of executing the scheme or, in other words, incidental to an essential part of the scheme." *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)). Plaintiffs have more than adequately alleged that the mails were used to further the tax shelter scheme, and that their use was essential. Manko, Edelman, and Bushnell allegedly used the mails to issue false offering circulars and promotional materials, Am.Compl. ¶¶ 69–72, 111; to supply the partnerships' outside auditors each and every year, beginning in 1979, with false confirmations of trades, which the auditors then used in preparing the partnerships' tax returns and financial statements, *id.* ¶¶ 75, 109, 111; and to send plaintiffs false discretionary account statements and K–1 schedules, which in turn caused plaintiffs to submit false tax returns to federal, state, and local tax authorities, *id.* ¶¶ 75(a), 111. Moreover, given the need to create the appearance of legitimacy for the billions of dollars worth of (allegedly) specious trades, it was entirely foreseeable that the enterprise would use the mails in communicating with the investor/partners and with outside auditors. That Tese and Sinclair did not personally drop the mailings in the mailbox is unimportant; all that matters is that they are alleged to have participated in an enterprise that foreseeably made use of the mails to perpetrate fraud. *Bortnovsky*, 879 F.2d at 36–37; *see also United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986) (inside traders "caused" mailings and wirings associated with publication and distribution of the *Wall Street Journal* where such mailings and wirings were a "normal and customary part" of the newspaper business and where they were central to the traders' scheme), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). We accordingly hold that plaintiffs have adequately alleged that Tese and Sinclair engaged in at least two predicate acts of mail fraud.

Because the same legal analysis applies to plaintiffs' allegations of wire fraud, *Morrow v. Black*, 742 F.Supp. 1199, 1205 (E.D.N.Y. 1990), and because plaintiffs' have adequately alleged the enterprise's use of the wires, *see* Am.Compl. ¶¶ 74, 92, 98, 111, we hold that plaintiffs have adequately alleged that Tese and Sinclair engaged in at least two predicate acts of wire fraud.

Finally, we would note that we find no merit in Tese and Sinclair's contention that the mail and wire fraud allegations have not been pleaded with enough particularity. We are convinced that plaintiffs' allegations of mail and wire fraud put Tese and Sinclair on ample notice of what they must defend against. *Accord Luce*, 802 F.2d at 55 ("Reference to the Offering Memorandum satisfies 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations."); *Beth Israel Medical Center v. Smith*, 576 F.Supp. 1061, 1071 (S.D.N.Y.1983) ("In view of the complaint's detailed description of the defendants' scheme ... the failure to describe particular letters or telephone calls is not fatal to the complaint.").

 *4. Pattern.* Tese and Sinclair claim that the predicate acts, as alleged, do not constitute a "pattern" of racketeering activity. Again, we disagree. The acts of mail fraud, wire fraud, and aiding and abetting securities fraud were hardly random or isolated events. Rather, the Amended Complaint portrays them as part of a single scheme to defraud the investors in the discretionary accounts and the limited partnerships and to deceive outside auditors and regulators. This alone demonstrates that the acts were related, and satisfies the relatedness aspect of the "pattern" definition. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989) (defining "relatedness" as "criminal acts that have the same or

similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events"). Likewise, the predicates, which were allegedly committed over the course of the years 1978–83, were part of defendants' regular way of conducting their illicit tax shelter business; the Amended Complaint makes clear that maintaining the appearance of legitimate trading activity required a steady flow of paper confirmations and documentation. The predicates thus amounted to a closed period of repeated conduct in the past that satisfies the "continuity" aspect of the "pattern" definition. *See id.* at 240–42, 109 S.Ct. at 2901–02.

Given all of the foregoing, we hold that plaintiffs have stated a claim that Tese and Sinclair violated Section 1962(c).[21]

■ We also uphold against Tese and Sinclair plaintiffs' third claim for relief, which is that "defendants, and each of them" conspired to violate Section 1962(c). Am.Compl. ¶ 136. To state a claim of RICO conspiracy, a plaintiff must allege that the defendant "embraced the objective of the alleged conspiracy, and agreed to commit two predicate acts in furtherance thereof." *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994) (quoting *United States v. Neapolitan*, 791 F.2d 489, 495 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986)).

For the reasons already given in our discussion of scienter, we believe plaintiffs have stated facts from which one could infer a knowing embrace by Tese and Sinclair of the tax shelter fraud, and an agreement on their part to commit acts in support of it.

## D. The Underwriting Defendants

Plaintiffs charge that a group of defendants "knowingly participated in and aided and abetted the [fraudulent] plan and scheme by marketing the limited partnership interests to plaintiffs and other investors in the investment partnerships . . . and by acting as placement agent and underwriters for the investment partnerships." Am.Compl. ¶ 98. Four of these defendants—Barry Lyman, Palisades Planning Corp., Evelyne Simon, and Cosmopolitan Planning, Ltd.[22]—argue that the Amended Complaint fails to allege facts sufficient to establish their scienter or to state a RICO claim against them. They move pursuant to Rules 9(b) and 12(b)(6) to dismiss the Amended Complaint.

■ We agree that plaintiffs have failed to plead facts giving rise to a "strong inference" of fraudulent intent on the part of Simon and Cosmopolitan. Plaintiffs attempt to state a case of fraudulent intent by pointing out that Simon and Cosmopolitan were involved in marketing the limited partnerships, Am.Compl. ¶¶ 74, 98, and that they were paid well for their involvement, *id.* ¶¶ 101–103. But neither of these facts suggests fraud, much less a "strong inference" of fraud. The element of motive, for one, is missing. Unlike the situation with Tese and Sinclair, the Amended Complaint does not allege or suggest any benefit that flowed to Simon or Cosmopolitan from the fraudulent nature of the trading activity as such; the compensation they received presumably would have been the same had the trading been genuine. Further, there was nothing atypical in anything Simon and Cosmopolitan are alleged to have done. Their underwriting efforts, as alleged, were straightforward; there was no involvement with empty shell corporations, no transfer of corporate ownership free of charge. Needless to say, mere involvement with a business that happened to be run on a phony basis suggests only business association, not fraudulent intent.

---

**21.** In light of our holding, we need not determine whether plaintiffs' second claim for relief can withstand a motion to dismiss. Like the first claim for relief, the second claim alleges a violation of 18 U.S.C. § 1962(c). The one important point of difference between the first and second claims is in the identity of the alleged enterprise: in the second claim, plaintiffs allege that Arbitrage Management (a general partnership comprised of Manko, Edelman, and Bushnell), GCC, GSTC, TSM and each of the limited partnerships are all RICO enterprises. Am.Compl. ¶ 128.

**22.** Lyman is alleged to have been a principal and majority stockholder of Palisades Planning Corp. at all relevant times subsequent to 1978. Am. Compl. ¶ 11. Simon is alleged to have been the president, treasurer, and principal stockholder of Cosmopolitan Planning, Ltd. at all relevant times subsequent to May 1980. *Id.* ¶ 22.

■ We reach a different conclusion with respect to Lyman and Palisades. Paragraph 100 of the Amended Complaint contains excerpts from Lyman's testimony at the trial of Manko and Edelman. These excerpts, together with longer passages of Lyman's testimony submitted by the parties as exhibits to their motion papers,[23] reveal several things: First, that Lyman testified at the Manko/Edelman trial under a criminal immunity agreement with the Government, Exh. A to Plaintiffs' Memorandum of Law in Opposition to the Motion of Defendants Barry Lyman and Palisades Planning Corp. to Dismiss or for Summary Judgment ("Pls.' Mem. in Opp. to Lyman's Motion") at 118; second, that during the years 1978–1983, Lyman frequently discussed with Manko "everything associated with the tax aspects of [the] partnerships," *id.* at 159, and constantly discussed with Manko and Edelman the types of transactions the partnerships were doing, *id.* at 221; and third, that Manko and Edelman told Lyman in 1982 and 1983 that the partnerships were engaged in both "tax" transactions (*i.e.,* transactions that would generate tax losses and that the IRS could find to be insufficiently profit-motivated) and non-tax transactions (*i.e.,* transactions that had the potential to generate profit), and, further, that the non-tax transactions were intended to shield the tax transactions from scrutiny by the IRS, *id.* at 557, 560–61. In our view, these revelations suggest that Lyman may have known about, and been involved in, the fraudulent scheme. They are certainly substantive enough to justify allowing plaintiffs to proceed against Lyman beyond the pleading stage.

Like Tese and Sinclair, Lyman also contends that the RICO counts, as pled, fail to allege elements necessary to state a claim against him. Only one of Lyman's arguments gives us pause, and that is his argument, based on *Reves v. Ernst & Young, supra,* that as an underwriter of the partnerships, he did not operate or manage the tax shelter enterprise.

Whether professionals who closely serve an enterprise from outside its walls can be said to participate in its operation or management is a difficult question. *Reves* strongly suggests that the entities most amenable to RICO liability are those existing within an enterprise, not outside entities serving an enterprise. *Reves,* 113 S.Ct. at 1173. Indeed, in stating that outsiders "associated with the enterprise" could be liable under RICO, the Court offered only one scenario—that of bribery—which does not appear to apply here. *Id.*

■ We need not decide this question, however, in order to reject Lyman's argument. For the Amended Complaint alleges not only that Palisades marketed the limited partnerships as an outside professional service, but also that it received annual fees for administrative services it rendered the partnerships. Am.Compl. ¶ 104. Specifically, Palisades, and Lyman through Palisades, received ongoing fees for disseminating information about the partnerships to the limited partners. Lyman testified at the Manko/Edelman trial that:

> They [the limited partners] would call us with questions and we would respond to them after speaking with the general partners [Manko, Edelman, Bushnell]. It was a fee [sic] in such a way that the investors did not have to call directly down to the general partners, they did it through us. We kept track of the investors, we answered any questions, to send out [sic] the monthly statements on behalf of the general partners.

Exh. A to Plaintiffs' Mem. in Opp. to Lyman's Motion at 697. In other words, plaintiffs' allegations are to the effect that Palisades served as a front office of the partnerships, the reasonable inference being that Palisades became a part of the enterprise, operating from within it. Whether plaintiffs

---

**23.** Given that plaintiffs have cited portions of Lyman's testimony in the Amended Complaint, we may review the extended excerpts of the testimony submitted by both sides in deciding this motion, regardless of whether it is considered a Rule 12(b)(6) or a Rule 56 motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

will be able to prove facts showing that Lyman and Palisades played a large enough role in operating or managing the enterprise to be subject to RICO is a question for a post-discovery summary judgment motion or the trial stage of this litigation. At this point, it is enough that plaintiffs have pleaded facts sufficient to state the "participation" element of their § 1962(c) claim.

Finally, Lyman argues that some of the plaintiffs may not understand that he is a defendant in this action, or may not know the basis of the claims against him. He asks the Court to direct plaintiffs' counsel to provide him with written proof of counsel's authority to represent all of the plaintiffs.

We decline to do so. Lyman's remedy lies in the opportunity he will have to depose the plaintiffs herein, and to move for summary judgment in the event that he can establish that certain plaintiffs have not in fact authorized suit against him.

### E. The Taslitz Defendants

Steven Taslitz, Ethan Schwartz, Wade Rowland, and Virginia McGathey comprise a group of defendants (the "Taslitz defendants") against whom the sole allegation is that they were general partners of some of the limited partnerships and that, as such, they are jointly and severally liable for the RICO violations of their partnerships and of the managing general partners Manko, Edelman, and Bushnell. Am.Compl. ¶¶ 19, 20, 24, 26, 117. Plaintiffs contend that Congress did not intend, by enacting the RICO statute, to override the well-established rule that general partners are liable for the tortious acts of their partnerships and co-partners which are performed in the course of the partnership business. *See, e.g.,* N.Y. Partnership Law §§ 24, 26 (McKinney 1988).[24] Defendants counter (among other things) that the imposition of vicarious liability on passive general partners would go against the language of the RICO statute, which requires culpable participation, and that it would be unfair to impose treble damages on persons who had no involvement in or knowledge of the wrongful conduct.

The question before us is whether normal doctrines of partnership liability apply in a civil action brought under § 1962(c) of RICO. There appears to be no binding law on this Court which is directly on point. However, in *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (hereinafter "*ASME*"), a case dealing with a corporation's civil liability under the antitrust laws for acts of its agents performed with apparent authority, the Supreme Court accepted the proposition that general principles of agency law apply absent Congressional intent to the contrary. "[W]e can honor the statutory purpose best by interpreting the antitrust private cause of action to be at least as broad as a plaintiff's right to sue for analogous torts, absent indications that the antitrust laws are not intended to reach so far." *Id.* at 569, 102 S.Ct. at 1943; *see also Bernstein v. IDT Corp.,* 582 F.Supp. 1079, 1083 (D.Del.1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent.").

Neither the language nor the legislative history of RICO speaks to the issue of vicarious liability, let alone to the issue of partnership liability, a subspecies of vicarious liability. However, having consider the language and the purpose of § 1962(c), and of the RICO statute as a whole, we see no basis for concluding that the statutory scheme would be disrupted by the application of partnership liability in the civil RICO context. The primary purpose of RICO is "to cope with the infiltration of legitimate businesses [by organized crime]." *Turkette,* 452

---

**24.** Section 24 reads:

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is cause to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Section 26 reads:

All partners are liable

1. Jointly and severally for everything chargeable to the partnership under section[] twenty-four. . . .

U.S. at 591, 101 S.Ct. at 2533. It is not unreasonable to think that if partners are held civilly liable for the RICO violations of their partnership and co-partners, they will have an added incentive to take steps to reign in misconduct by their colleagues.

The Taslitz defendants raise a host of conceptual difficulties to applying partnership liability in the RICO context, but none compels the result they seek. To begin with, joint and several liability is not inconsistent with the scienter requirement that must be met to prove RICO's fraud-based predicate acts. As Judge Lowe pointed out in *Northwestern Nat. Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 512 (S.D.N.Y.1984), "in the partnership context, the scienter requirement is satisfied as long as the partner or partners actually involved in the wrongdoing[ ] acted with scienter." One must distinguish the idea of the mens rea of a crime from the idea of the category of persons who are to be held liable for the crime. It should also be noted that courts have upheld vicarious liability in two areas of the law in which intent must usually be proven in order to establish a primary violation: antitrust, *see ASME*, 456 U.S. 556, 102 S.Ct. 1935, and securities, *see, e.g., In re Atlantic Financial Management, Inc.*, 784 F.2d 29 (1st Cir.1986) (Breyer, J.), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987).

Nor do we see how imposing treble damages on an innocent actor, based solely on the nature of his relationship to a RICO wrongdoer, frustrates the purposes of RICO. If it is unfair, as the Taslitz defendants contend, it is no more so than imposing treble damages on an unwitting corporation for the antitrust violations of its agents—the very sanction upheld by the Supreme Court in *ASME*. *See* 456 U.S. at 574–76, 102 S.Ct. at 1946–48.

We acknowledge that some courts have held that vicarious liability is inconsistent with the language of § 1962(c), which supposedly is phrased in a way as to limit rather than expand the range of potential violators. *See, e.g., D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 966–67 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 33 (1st Cir. 1986). But we find § 1962(c)'s language to be neither expansive nor restrictive, just particular; as we have seen, the provision's prohibition consists of several distinct elements. The mere fact that § 1962(c) does not by itself deal with all possible wrongdoing under RICO, but leaves some work for other provisions, such as § 1962(a), does not mean that it is narrow in scope, or that it must be read as implicitly rejecting the idea of vicarious liability.

We also acknowledge the cases that have held that corporations cannot be held vicariously liable for the RICO violations of their employees. *See, e.g., Schofield*, 793 F.2d at 32–33; *First Nat. Bank of Louisville v. Lustig*, 727 F.Supp. 276, 280 (E.D.La.1989); *Rush v. Oppenheimer & Co.*, 628 F.Supp. 1188, 1194–95 (S.D.N.Y.1985). But the resolution of the issue of vicarious liability in these cases was intimately bound up with the holding that, as a matter of statutory construction of § 1962(c), a corporation may not be named as both a defendant "person" and as the RICO "enterprise." Holding a corporate "enterprise" vicariously liable for the RICO violations of its employees would circumvent § 1962(c)'s distinction between "enterprise" and "person" and "accomplish indirectly what . . . the statute directly denies." *Schofield*, 793 F.2d at 33. In this case, however, imposing vicarious liability on the general partners of the limited partnerships would not conflate the "enterprise" with the "person," since the general partners are not alleged to constitute the "enterprise." These cases are thus of limited precedential value here.

Finally, we acknowledge the caution with which courts should construe statutes as permitting the imputation of criminal intent to innocent actors. But RICO is not first and foremost about the commission of criminal acts; it is about the commission of a very pernicious kind of business tort. And in civil RICO, at least, vicarious-liability defendants do not face the quintessential sanction of the criminal law, imprisonment. *See* 18 U.S.C. § 1964 (civil remedies under RICO include divestiture of interest in an enterprise; re-

strictions on future activities or investments; and treble damages).

We conclude that the Taslitz defendants' status as general partners of some of the limited partnerships makes them proper RICO defendants in this action. Their motion to dismiss is accordingly denied.

Two defendants in this action, Morris David de Young and Alan Steven Cohen, are alleged both to have been general partners of a limited partnership and to have promoted the sale of limited partnership interests to plaintiffs. Am.Compl. ¶¶ 23, 25. Not surprisingly, plaintiffs proceed against them on a theory of partnership liability as well as on a theory of direct liability. *See id.* ¶¶ 117, 120. To the extent partnership liability is alleged, de Young and Cohen are proper defendants in this action. To the extent the Amended Complaint places de Young and Cohen in the same category as the underwriting defendants and asserts that they comprised part of the "association-in-fact" enterprise, it is dismissed; the Rule 9(b) deficiencies in plaintiffs' allegations of fraud against de Young and Cohen are at least as great as the deficiencies in plaintiffs' allegations of fraud against Evelyne Simon and Cosmopolitan Planning, discussed *supra* pp. 1531–1532.

## CONCLUSION

For the reasons set forth above:

1. The motions to dismiss made by Bernhard Manko, Vincent Tese, James Sinclair, Barry Lyman, Palisades Planning Corp., the Taslitz defendants, Morris David de Young, Alan Steven Cohen, Robert Carlock, Archibald Devlin, Eleanor Goudreau, and Joseph Bryant are denied with two exceptions:

(a) Defendants' motion to dismiss the state law fraud count as time-barred is granted;

(b) Plaintiffs may only proceed against defendants de Young and Cohen on a theory of joint and several partnership liability;

2. The motion to dismiss made by Evelyne Simon and Cosmopolitan Planning, Ltd., is granted;

3. Plaintiffs' motion for a default judgment against Bernhard Manko is denied;

4. The motions for Rule 11 sanctions made by Tese, Sinclair, McGathey, and the Taslitz defendants are denied.

SO ORDERED.