**In re Robert G. BUSHNELL, Debtor.**

**Bankruptcy No. 94–10706 (FGC).**

United States Bankruptcy Court,
D. Vermont.

Aug. 23, 1996.

R. Babitt, of Anderson Kill & Olick, P.C., New York City, and P.A. Kantor of Green-

field Stein & Senior, LLP, New York City, for Claimants.

G.A. Riso, of Stein Riso Haspel & Jacobs, LLP, New York City, and B.M. Lewis, of Obuchowski & Reis, Bethel, VT, for Robert G. Bushnell (Debtor).

## MEMORANDUM OF DECISION GRANTING DEBTOR'S MOTION FOR SUMMARY JUDGMENT

·FRANCIS G. CONRAD, Bankruptcy Judge.

Debtor's objection[1] to RICO claims totalling more than $163 million is before us on the parties' cross motions for summary judgment. Claimants bought, from entities established by Debtor and his two partners, interests in tax shelters that produced no gains and no losses; at least none that the IRS would recognize.

All Claimants are plaintiffs in either one of two lawsuits pending in the Southern District of New York against Debtor,[2] his two partners, and other defendants. Proofs of claim totalling $800,000 have been filed in this case on behalf of plaintiffs in *Marcus, et al. v. Manko, et al.*, which was filed Feb. 3, 1993. Those claims are dwarfed by the $162,350,-138 in claims filed in *131 Main Street Associates, et al. v. Manko, et al.*, originally filed Feb. 8, 1993.

Both suits were filed, just barely, within four years of Feb. 9, 1989, the date federal indictments for criminal tax evasion against Debtor's two partners, Bernhard Manko and Jon Edelman, made headlines across the nation.[3] As will be seen, Claimants contend that this is the date their RICO causes of action accrued, because it was the date they first became aware that losses they had known about for years were caused by fraud.[4]

Debtor contends the claims are barred by the 4–year RICO statute of limitations; that Claimants have defaulted on their discovery obligations and should be barred from proving their claims; and that a recent amendment to the RICO statute retroactively precludes use of RICO in actions based on securities fraud.

Claimants seek summary judgment on the ground that judgment, albeit by default, was entered on June 17, 1996 against one of Debtor's partners, Edelman, in the *131 Main Street* case; that both Edelman and Manko were convicted of criminal tax evasion and conspiracy;[5] and that under New York law one member of a partnership is liable for the tortious conduct of another, even though other members of the firm had no knowledge of the tortious conduct.

We grant summary judgment to Debtor, sustaining his objections to the claims, on the grounds that the claims are barred by the RICO statute of limitations. Accordingly, we do not reach the other issues raised by the parties.

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to this Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. §§ 157(b)(2)(A), (B), and (*O*). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

2. The actions were stayed as to Debtor when he filed bankruptcy in Vermont.

3. Reuters reported, for example:

In one of the largest tax fraud cases on record, Bernhard Manko, ... and Jon Edelman ... were charged in a 32–count indictment with participating in a conspiracy to defraud the Internal Revenue Service and assisting others in making false statements in tax returns.

Appleson, *Two Are Indicted in $38 B Tax Scam*, Reuters, Bergen Record, Feb. 9, 1989 at C10.

4. Claimants actually contend that Feb. 8, 1989, the date the indictments were returned, is the critical date. Our Nexis search for all newspaper stories containing "Manko" and "Edelman" indicates, however, that the news was carried only in wire service reports on Feb. 8, 1989, and did not actually hit the newsstands until Feb. 9, 1989. Our use of Feb. 9, 1989 as the critical date keeps the *131 Main* claimants in the ballgame for a bit longer than they would be if we used Feb. 8, 1989. The complaint in *131 Main* was filed Feb. 8, 1989, the first day of the fifth year after the indictment was returned. Use of Feb. 9, 1989 as the critical date means that their complaint was filed on the last day of the fourth year after filing.

5. Debtor was never indicted.

## SUMMARY JUDGMENT

■ To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in F.R.Civ.P. 56 as made applicable by F.R.Bkrtcy.P. 7056. F.R.Civ.P. 56(c) provides in part:

> [T]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Eastman Machine Company, Inc. v. United States,* 841 F.2d 469 (2d Cir.1988); *Hossman v. Spradlin,* 812 F.2d 1019, 1020 (7th Cir.1987); *Clark v. Union Mutual Life Ins. Co.,* 692 F.2d 1370, 1372 (11th Cir.1982); *United States Steel Corp. v. Darby,* 516 F.2d 961, 963 (5th Cir.1975). The primary purpose for granting a summary judgment motion is to avoid unnecessary trials where no genuine issue of material fact is in dispute. *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987).

■ When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett, supra,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Summary judgment is appropriate here because there are no genuine issues of material fact.

## FACTUAL BACKGROUND

The history of how Claimants came to sustain such large losses was recounted, from their perspective, by the Court in *131 Main*

**6.** The factual background underlying these claims against Debtor is also described in detail in both *United States v. Manko,* 979 F.2d 900 (2d

*Street Associates v. Manko,* 897 F.Supp. 1507 (S.D.N.Y.1995).[6]

What plaintiffs essentially allege is that, beginning in or around 1977, defendants embarked on a scheme to induce individual investors to invest in what purported to be two types of tax-advantaged investment vehicles: discretionary trading accounts and limited partnerships. Defendants allegedly represented to potential investors that they, or the limited partnerships to be established by them, would enter into profit-motivated transactions in the field of government-backed securities, and that these transactions, precisely because they would be profit-motivated and carry risk, would generate losses that the investors could successfully claim as loss deductions on their individual tax returns. In making their decisions to invest in the trading accounts and the limited partnerships, plaintiffs maintain that they relied upon representations contained in private placement memoranda issued by defendants to the effect that no security transactions would be entered into unless they had enough economic substance to be capable of producing a pre-tax profit.

*131 Main Street Associates, supra,* 897 F.Supp. at 1513.

The injuries suffered by the investors were described in *131 Main* as follows:

> Plaintiffs[ ] claim that defendants' pattern of fraudulent misrepresentations and bogus trading activity caused them to lose their investments, to lose any chance of earning profit on their investments, to incur large income tax deficiencies and interest penalties as a result of the IRS's disallowance of their tax deductions, and to incur expenses in defending themselves from the IRS's challenges to their tax filings.

*Id.*

## NOTICE OF INJURY

■ Debtor contends that the date Claimants knew or should have known of their injuries is the critical date for statute of

Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993), and *Greenwald v. Manko,* 840 F.Supp. 198 (E.D.N.Y.1993).

limitations purposes. The unrebutted affidavit of attorney Hugh Janow, submitted by Debtor, establishes that, beginning in the mid–1980's the IRS "began examining the activities of the Arbitrage Partnerships," and issuing notices of deficiency to the Arbitrage Partnerships' investors. Janow Affidavit, ¶ 4. Janow was one of three attorneys appointed by the Tax Court as lead counsel on behalf of the various investors whose partnership losses had been challenged by the IRS. Judge Sand, in *131 Main*, summarizes the subsequent negotiations between Claimants and the IRS, noting,

> by late December 1987, the IRS and *counsel for all of the partners of all of the limited partnerships* had worked out a global settlement, the terms of which fixed the allowable losses and reportable gains for all of the partnerships and the way in which interest penalties would be calculated.

*131 Main, supra*, 897 F.Supp. at 1516 (emphasis added). We find, as Judge Sand did, that:

> All of [the] evidence indicates that plaintiffs' tax-related injuries occurred prior to February 8, 1989, and that plaintiffs knew of their extent. The very disallowances of which plaintiffs complain were made by the IRS over the course of the years 1985–88, and agreement on the formula by which the partners' tax deficiencies would be computed was reached by the end of 1987. A number of partners accepted the terms of the agreement in January 1988. By January 1988, then, all of the partners—plaintiffs included—knew that they had incurred tax-related expenses of a provable amount. And it was the partners' obligation to pay those expenses, not the actual payment as such, that counted as an economic injury for purposes of the accrual of RICO's statute of limitations.

*Id.*[7] Accordingly, we hold that Claimants knew or should have known of their injury well prior to Feb. 9, 1989. Accordingly, if notice of injury is the critical date for accrual of a RICO cause of action, then Claimants'

claims are barred by the four-year RICO statute of limitations.

## NOTICE OF FRAUD

Claimants contend that both notice of injury and notice of fraud are prerequisites to the accrual of a RICO cause of action. Judge Sand summarized the Claimants' contentions as to fraud.

> The fraud in the sale of these tax-deferral investments lay in the fact that defendants allegedly never had any intention of conducting bona fide, profit-driven transactions in the securities markets. Rather, it is alleged that defendants, on their own and through secret oral agreement with a third-party trading entity, orchestrated billions of dollars worth of prearranged and fictitious trades in put options, Treasury Bill straddles, and repurchase agreements. These paper transactions, which, as one court has put it, consisted of "typing, not trading," were allegedly rigged from the outset to generate nothing but losses for the trading accounts and the partnerships, which losses were then passed through to the individual investors, who wrongfully (albeit unwittingly) claimed them as deductions on their tax returns. It is further alleged that defendants looted the money that plaintiffs invested in the trading accounts and partnerships by way of the commissions they awarded themselves for their trading account activity; by way of the incentive compensation they paid themselves as managers of the investment vehicles; by way of "fees," disguised as interest expenses, they paid to the third-party trading counterpart of the partnerships; and by way of the wasted operating expenses of the trading accounts and the partnerships.

*Id.*, at 1513 (citations omitted). We turn now to the issue of when Claimants knew or should have known that their losses had been caused by fraud.

Debtor contends that the communications from the IRS in the mid 1980s disallowing investor losses should have put Claimants on

---

**7.** Claimants do not now dispute this point, though they did before Judge Sand. *See, 131*      *Main, supra*, 897 F.Supp. at 1517–18.

notice of fraud. Claimants all received from IRS a "Notice of Deficiency" that included an "Explanation of Adjustments" in substantially the following form:

> Ordinary Loss: It is determined that the gains and losses claimed by you in [applicable tax year] with respect to commodity straddle transactions cannot be recognized because you have not established that the gains and losses occurred or occurred in the manner claimed. *The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes. Recognition of the claimed loss(es) in [applicable tax year] would distort the economic reality of the entire transaction. No genuine loss occurred, the alleged loss was but one step in a series of integrated transactions and the entire transaction lacked economic reality.*

Janow Affidavit, ¶ 4 (emphasis in original). Claimants contend that the IRS notices, despite their "inflammatory language" "were not 'storm warnings' of fraud," but simply "nothing more than a burden-shifting exercise" wherein the IRS "can challenge positions taken by taxpayers on their returns, and require them to prove, as an initial matter, that those positions are *bona fide.*" Claimants' Memorandum in Opposition to Debtor's Motion for Summary Judgment and in Support of Claimants' Cross–Motion for Summary Judgment, 28–29. Nonetheless, the Notices of Disallowance told it like Claimants contend it proved to be.

Claimants argue, however, that their explanation "for not perceiving the cited IRS disallowance notices as "storm warnings" is more than plausible." *Id.,* at 31. That explanation is that it was "entirely fair for claimants to have deemed the IRS disallowance notices a non-issue" because "independent law firms whose retainers they were directly paying" were telling them they had nothing to worry about. *Id.,* at 32. More particularly, to quote from Claimants' brief, *Claimants'* own counsel [8]

specifically negated the possibility of phony trading, writing that "the documentary evidence will identify the third parties on the other side of the transactions ..." Counsel further specified that the notices were of a preliminary nature; had been prepared without the benefit of an actual audit; and showed unfamiliarity with what was plainly a specialized type of trading. All of these factors minimizing the significance of the IRS disallowance notices would have made sense intuitively.

More important for our purposes than what their own counsel told them, however, is what their own counsel apparently didn't tell them. Judge Jacobs of the Tax Court found as a fact, in *Manko v. Commissioner,* T.C. Memo 1995–10; 1995 Tax Ct. Memo LEXIS 10; 69 T.C.M. (CCH) 1636, 1995 WL 39228, that Claimants' counsel "knew of the possibility of a criminal investigation as of December 1987." This is confirmed by the unrebutted affidavit of Janow, who states that during 1986,

> criminal investigations were commenced against the Arbitrage Partnerships' promoters Bernhard Manko ... and Jon Edelman ... relative to their conduct and the conduct of the Arbitrage Partnerships. These investigations were not secret and were known by us some time in 1987.

Janow Affidavit, ¶ 9. Indeed, attached to the Janow Affidavit as Exhibit E are copies of two letters sent to Claimants' counsel in mid–1988 [9] by the IRS lawyer responsible for negotiating the global settlement with investors. The letter advised Claimants' counsel that "[p]ursuant to the request of the United States Attorney's office, we are suspending consideration of the settlement" as to Manko and Edelman respectively. The involvement of the U.S. Attorney's Office was a clear signal that a criminal investigation was underway. Based on the foregoing evidence, we find that Claimants' counsel knew, prior to Feb. 9, 1989, that criminal investigations of Manko and Edelman were underway "relative to their conduct and the conduct of the

---

8. In their Reply Memorandum of Law in Support of Cross–Motion for Summary Judgment, Claimants "point out that *they were represented by tax counsel* as a group...." (Emphasis added.)

9. The exact dates are illegible.

Arbitrage Partnerships." Janow Affidavit, ¶ 9.

Claimants attempt to deflect the evidence that their counsel knew of the criminal inquiry in three ways, all of which fall short. First, they argue,

> "[D]ebtor's contention that claimants learned about a criminal investigation of the Arbitrage Management partnerships before the indictment of Manko and Edelman was announced [is] no more than a constructive knowledge argument. Neither debtor nor any of the defendants in *131 Main Street Associates* have come up with a shred of evidence to show that *claimants* became aware of a criminal investigation before the Manko and Edelman indictment, despite great incentive to do so."

Claimants Brief, p. 34 (emphasis added). Constructive knowledge is all that the law requires, however. *131 Main, supra,* 897 F.Supp. at 1514 (actual or constructive knowledge will suffice).

Secondly, Claimants proffer a quote carved out of context for the proposition that Barbara Kaplan, Esq., one of the three lawyers representing Claimants did not understand that the reason for the suspension was the pending criminal investigation, from which we are to infer that she didn't know about it. In fact, it is quite clear from the context of Ms. Kaplan's testimony at the criminal trial of Manko and Edelman that she was not referring to whether or not a criminal inquiry was underway. Rather, she didn't understand how the IRS could suspend consideration of a settlement it had already agreed to.[10] Finally, Claimants argue that

> Hugh Janow's interests are adverse to those of claimants and
>
> . . . (the premise forming the basis of the imputation principle—i.e., that an agent will live up to the duty to act in the principal's interests in light of all pertinent information he has acquired— "crumbles when the agent has an interest adverse to the purported principal"); *Hartford Accounting & Indemnity Co. v. Walston & Co.,* 21 N.Y.2d 219, 225–26, 234 N.E.2d 230, 287 N.Y.S.2d 58 (1967).

> *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 690 n. 10 (2d Cir.1983).[11]

Claimants fail to give us sufficient information from which to conclude that Janow's *"interests in the deal* were in fact adverse to those of [Claimants]." *Id.* (Emphasis added). Moreover, no suggestion is made that the interests of the other two lawyers representing Claimants were adverse to those of Claimants. Nor do Claimants rebut Debtor's showing that the other two lawyers were aware of the criminal investigation.

Accordingly, we find that Claimants' counsel knew, prior to Feb. 9, 1989, that criminal investigations of Manko and Edelman were underway "relative to their conduct and the conduct of the Arbitrage Partnerships." And we hold that this knowledge of Claimants' counsel is imputed to Claimants. *Id.,* 717 F.2d at 689 n. 9; *Armstrong v. Ashley,* 204 U.S. 272, 283, 27 S.Ct. 270, 274, 51 L.Ed. 482 (1907); *Ansbro v. Southeast Energy Group, Ltd.,* 658 F.Supp. 566, 572 (N.D.Ill.

---

**10.** The relevant portion of the exchange is as follows:

> THE COURT: Wait. You received a letter from [IRS Attorney] dated July 20, 1988, that the settlement was suspended as to Mr. Edelman?
> THE WITNESS: That's correct. I'm not sure if it says suspended.
> THE COURT: Please read what it says into the record so we know.
> THE WITNESS: It says, "Dear Ms. Kaplan, pursuant to the request of the United States Attorney's Office, we are suspending consideration of the settlement of the above subject matter until September 30th, 1988."
> THE COURT: Now, what did you understand that letter to mean?

> THE WITNESS: I really didn't understand the letter because my understanding was and is that Mr. Edelman's case was settled, and didn't understand what the purpose of it was.
> THE COURT: Apparently that is not the understanding of the Service, is it?
> THE WITNESS: I'm not certain.

Claimants' Schedule of Exhibits, Volume I, Exh. H. The Tax Court held that Ms. Kaplan was right, and that a settlement had indeed been reached. *Manko v. Commissioner, supra,* 1995 Tax Ct. Memo LEXIS at *13.

**11.** This is a curious citation. The parenthetical quote goes with the prior citation, which was omitted, and not with the citation to *Hartford Accounting,* which follows.

1987); *Aberson v. Glassman,* 70 F.R.D. 683, 684 (S.D.N.Y.1976).

█ Ultimately, however, we hold that the date of actual or constructive knowledge of fraud is irrelevant, because a RICO claim accrues on the date the claimant knows or should know of the injury. This, we believe, is the rule established in the Second Circuit by our Court of Appeals in *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988). Justice Pratt stated the rule clearly, unambiguously, and more than once:

> [W]e ... hold that each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. Sec. 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury.

*Id.,* at 1102.

> [C]ongress tied the right to sue for damages under Sec. 1964(c), *not to the time of the defendant's RICO violation,* but to the time when plaintiff suffers injury to "his business or property" from the violation. Consequently, a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury.... [A] plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, *regardless when the RICO violation causing such injury occurred.*

*Id.,* at 1103 (emphasis added).

> [E]ach time plaintiff discovers or should have discovered an injury caused by defendant's violation of Sec. 1962, a new cause of action arises as to that injury, *regardless of when the actual violation occurred.* A plaintiff ... must then bring his action within four years of this accrual to recover damages for the specific injury.

*Id.,* at 1105.

The Second Circuit found "support for this holding in two major sources." *Id.,* at 1102. "First and most important," the Court held, "the plain language of the statute requires it," because "Section 1964(c) provides that only a 'person injured in his business or property by reason of a violation of section 1962' may bring a civil RICO action." *Id.,* at

1102. The second source of support for the Court's holding is the fact that the Clayton Act has the same rule of accrual.

In holding that the Clayton Act's four-year statute of limitations was "the most appropriate limitations period for [civil] RICO actions", the Supreme Court explicitly recognized that "the civil action provision of RICO was patterned after the Clayton Act." *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 150, 155–57, 107 S.Ct. 2759, 2764, 2767, 97 L.Ed.2d 121 (1987). Indeed, "[t]he 'clearest current' in the legislative history of RICO 'is the reliance on the Clayton Act model.'" *Id.* at 151, 107 S.Ct. at 2764 *(quoting Sedima [v. Imrex Co.]* 473 U.S. [479] at 489, 105 S.Ct. [3275] at 3281 [87 L.Ed.2d 346] [(1985)]). Noting the statutes' similarities, the Court found that both RICO and the Clayton Act "are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees"; that both statutes "bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate"; that "the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages"; and that both statutes "aim to compensate the same type of injury" by requiring "that a plaintiff show injury 'in his business or property by reason of' a violation". *Id.* at 151, 107 S.Ct. at 2764.

In light of these similarities, we have little trouble in concluding that the same statute which lends its four-year limitation period to civil RICO actions should also lend its rule of accrual in determining when the four-year period begins to run. Generally, a cause of action under the Clayton Act accrues and the statute of limitations begins to run, when a defendant commits an antitrust violation that injures a plaintiff's business. *Zenith [Radio Corp. v. Hazeltine Research, Inc.],* 401 U.S. [321] at 338, 91 S.Ct. [795] at 806 [28 L.Ed.2d 77 (1971)]; *Berkey Photo [Inc. v. Eastman Kodak Company]* 603 F.2d [263] at 295 [2nd Cir.1979]. An action for the injury

must be brought within four years, plus any additional period during which the state of limitations may be tolled. *Zenith*, 401 U.S. at 338, 91 S.Ct. at 806.

*Id.*, at 1104.

Claimants, however, contend that we should apply a different rule, the one used by Judge Sand in *131 Main*. Judge Sand held:

> To say that RICO injury triggers the running of the four-year limitations period does not mean ... that a plaintiff's discovery of his RICO injury, be it actual or constructive, is a sufficient prerequisite of accrual. Rather, in the wake of *Bankers Trust*, it is only a necessary prerequisite of accrual. A plaintiff must obviously still have, in addition to knowledge of his injury, actual or constructive knowledge of the "bad acts" causing the injury in order for the limitations period to accrue. Were it otherwise, suit would be foreclosed to injured parties who through no fault of their own had no reason to suspect that their financial setbacks were caused by violations of RICO.

*131 Main, supra*, 897 F.Supp. at 1514. We respectfully disagree with Judge Sand. As is apparent from the lengthy quotes above, *Bankers Trust* repeatedly and emphatically stated that a civil RICO cause of action accrues "each time plaintiff discovers or should have discovered an *injury* caused by defendant's violation of Sec. 1962, ... *regardless of when the actual violation occurred.*" *Bankers Trust, supra*, 859 F.2d at 1105 (emphasis added). "Naturally, as with all rules of accrual, the standard tolling exceptions apply," *id.*, to protect the reasonably diligent plaintiff who is unable to bring his action timely because of fraud or concealment by those responsible. But those who fail to exercise reasonable diligence are without a remedy.

## CONCLUSION

We hold that a civil RICO action accrues on the date a plaintiff knows or should know of an injury to his business or property, whether or not he knows that the injury is caused by a RICO violation. Suit must be brought within four years of that date, subject to standard tolling exceptions. We find

that Claimants here knew or should have known both of their injuries and of the bad acts that allegedly caused them more than four years prior to bringing suit. Accordingly, we grant summary judgment to Debtor, and the claims are disallowed.

Debtor's counsel to settle an order on five days' notice to Claimants.