**In re Robert G. BUSHNELL, Jr., Debtor.**

**No. 2:96–CV–352.**

United States District Court,
D. Vermont.

Oct. 27, 1998.

Mary Gilmore Kirkpatrick, Lisman & Lisman, Burlington, VT, Roy Babbitt, Anderson, Kill & Olick, Philip A. Kantor, Greenfield, Stein & Senior, New York City, for Claimants.

Bernard Merle Lewis, Obuchowski & Reis, Bethel, VT, for Debtor.

## OPINION AND ORDER [1]

SESSIONS, District Judge.

Fifty-six claimants ("Claimants") collectively appeal from an order of the United States Bankruptcy Court for the District of Vermont (Conrad, J.) which granted summary judgment and disallowed their civil RICO claims on the ground that they are time-barred by the applicable four-year statute of limitations. *In re Bushnell*, 199 B.R. 843 (Bankr.D.Vt.1996). The Bankruptcy Court's decision represents a final judgment in a core proceeding under 28 U.S.C. § 157(b)(2)(B), and this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) and (c)(1)(A).

On appeal to this Court, the Bankruptcy Judge's findings of fact may not be set aside unless clearly erroneous; conclusions of law are reviewed *de novo*. Bankruptcy Rule 8013; *National Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir.1996). The parties do not dispute that the applicable standard in this appeal is *de novo* review.

### Factual Background

The undisputed material facts are as follows. The Claimants are plaintiffs in either one of two lawsuits pending in the United States District Court for the Southern District of New York, *131 Main Street Associates v. Manko*, No. 93 Civ. 800(LBS) (S.D.N.Y. filed Feb. 8, 1993), and *Marcus v. Manko*, No. 93 Civ. 749(LBS) (S.D.N.Y. filed Feb. 8, 1993). Among their claims for relief, the plaintiffs in these suits have alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The Debtor, Robert G. Bushnell, Jr. ("Bushnell"), along with his two part-

---

**1.** Oral argument has not been requested in this case. The Court finds as well that the facts and legal arguments are adequately presented in the briefs and record, and that the decisional process would not be significantly aided by oral argument. *See* Bankruptcy Rule 8012.

ners and several other individuals and corporations are defendants in the suits.

During the late 1970's, Bushnell, Bernhard Manko and Jon Edelman, as Arbitrage Management Investment Company ("Arbitrage Management"), solicited investment in limited partnerships and discretionary trading accounts which were designed to be tax shelters. As the United States Tax Court described the company's activity, "[f]rom 1978 through 1981, Arbitrage Management dealt primarily in the acquisition of straddle positions in U.S. Treasury bill options. Beginning in 1982, Arbitrage Management dealt primarily in the acquisition of U.S. Government securities that were financed by repurchase agreements." *Manko v. Commissioner,* 74 T.C.M. (CCH) 1174 (1997) (*Manko II*). Arbitrage Management allegedly represented to potential investors that they "would enter into profit-motivated transactions in the field of government-backed securities, and that these transactions, precisely because they would be profit-motivated and carry risk, would generate losses that the investors could successfully claim as loss deductions on their individual tax returns." *131 Main Street Associates v. Manko,* 897 F.Supp. 1507, 1513 (S.D.N.Y.1995).[2]

Beginning in the mid–1980's the Internal Revenue Service ("IRS") began examining the activities of Arbitrage Management and its limited partnerships. Based on its investigation, the IRS issued notices of deficiency to the investors, including the Claimants, informing them of the amount of deficiency, or increase in their income tax. The notice included a form "Explanation of Adjustments" which contained the following language:

> The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes. Recognition of the claimed loss(es) in [tax year] would distort the economic reality of the entire transaction. No genuine loss occurred, the alleged loss was but one step in a series of integrated

transactions and the entire transaction lacked economic reality.

R. at 14(A). The management of the partnerships explained to the limited partners that the IRS determination was based on a tax court opinion that these types of transactions were insufficiently motivated by a desire for economic profit, and therefore the losses would not be recognized. *131 Main Street,* 897 F.Supp. at 1519.

The law firm retained by Arbitrage Management to represent the partnerships in the IRS investigation advised the limited partners in April 1986 that it would be able to demonstrate to the IRS that the transactions "occurred as claimed and that they were not prearranged or economically irrational." *Id.* Also in April, however, some if not all of the limited partners were informed that the IRS was charging that the transactions engaged in by certain of the partnerships did not actually occur and/or were not at arm's length with independent third parties. *Id.*

After Notices of Deficiency were issued to the investors, and Notices of Disallowance were issued to the Arbitrage partnerships, most of the investors filed petitions with the United States Tax Court to review the IRS's position. Approximately 200 Arbitrage Management tax cases were docketed. In January 1987 the United States Tax Court designated attorneys Nolan, Kaplan and Janow to serve as lead counsel for Arbitrage Management partners to conduct settlement negotiations with the IRS. On January 6, 1988 the negotiators informed the tax court that they had reached a tentative settlement agreement. *Manko II.* Attorney Kaplan presented IRS counsel with a list of Arbitrage Management partners who agreed to accept the IRS's settlement offer. She stressed that she provided the list as a courtesy, as she did not represent many of the limited partners. R. at 14(D). On February 25, 1988, the attorneys attended a pretrial conference in the tax litigation and advised the court that all or virtually all of the Arbitrage management partnership cases were settled, and that no trial would be required. They asked

---

**2.** The details of the financial transactions are further described in *United States v. Manko,* 979 F.2d 900 (2d Cir.1992).

to be relieved of their responsibilities as lead counsel, and the tax court discharged them. *Manko II*.

At some point between December 1987 and July of 1988 each of the lead counsel in the tax cases became aware of a criminal investigation conducted by the United States Attorney's Office into the conduct of Bushnell's two partners, Manko and Edelman, in connection with Arbitrage Management. In June and July of 1988 the IRS notified the former lead counsel that it was suspending consideration of the settlement at the request of the United States Attorney's Office. The criminal investigation culminated in an indictment of Manko and Edelman, handed down February 8, 1989, and their subsequent convictions on conspiracy, fraud and tax law violations. The government proceeded to trial on two theories: that the transactions never took place, or that the transactions could not form a proper basis for tax deductions. The jury determined that the transactions never took place. *United States v. Manko*, 979 F.2d 900 (2d Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993), *denial of habeas vacated*, 87 F.3d 50 (2d Cir.1996), *habeas denied on remand*, No. 95 CIV 1611, No. 96 CIV 3667, 1998 WL 391129 (S.D.N.Y. July 13, 1998).

On February 8, 1993 civil suits were filed in the Southern District of New York on behalf of the limited partners against the general partners and other entities, including attorney Janow, alleging RICO violations and state law claims of fraud. Bushnell filed a voluntary petition for bankruptcy (Chapter 11) on November 10, 1994, and the New York lawsuits have been stayed as to the claims against him. The Claimants filed proofs of claim in the bankruptcy case on April 4, 1995, to which Bushnell filed objection, asserting among other arguments that the statute of limitations had run on the Claimants' RICO claims.

The defendants in *131 Main Street* also challenged the plaintiffs' RICO claims as time-barred. In that case, Judge Sand held that a civil RICO action accrues once a plaintiff discovers or should have discovered an injury to business or property and the fraudulent acts causing that injury. *131 Main Street Associates*, 897 F.Supp. at 1514. He concluded that the plaintiffs knew of their injuries well outside the statute of limitations period, but that genuine issues of material fact precluded summary judgment on the issue of when the plaintiffs knew or should have known about the fraud. *Id.* at 1521.

On August 23, 1996, Judge Conrad granted summary judgment to Bushnell and disallowed the Claimants' claims, holding that a RICO cause of action accrues when a plaintiff knows or has reason to know of the injury, regardless of when the plaintiff discovers or has reason to discover the fraud. He found in the alternative that the Claimants were on notice of fraud more than four years before they filed their RICO lawsuits, and that the claims would have been time-barred under Judge Sand's accrual rule as well.

### Discussion

A four-year statute of limitations applies to civil RICO claims. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). A cause of action accrues when a plaintiff discovers or should have discovered the RICO injury. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988). The statute of limitations begins to run when plaintiffs are on actual or inquiry notice of the injury. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir. 1998). "Inquiry notice is notice such that a 'reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'" *Id.* (quoting *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir.1993)). *See also Kinley Corp. v. Integrated Resources Equity Corp. (In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Securities Litigation)*, 851 F.Supp. 556, 567 (S.D.N.Y.1994) (limitations period for a fraud-based RICO action commences when plaintiffs are placed on notice of facts which should arouse suspicion). Full knowledge of the fraud is not required; "mere awareness of the general nature of the fraudulent scheme is enough." *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F.Supp. 435, 444 (E.D.N.Y.1997). Under the "separate accrual rule," however, a new claim

accrues each time a new and independent RICO injury is incurred. *Bankers Trust,* 859 F.2d at 1103. *See also Bingham v. Zolt,* 66 F.3d 553, 559 (2d Cir.1995). A plaintiff thus may recover for separate and independent injuries flowing from a RICO violation which are discovered or discoverable within four years of the time suit is brought. *Id.* at 560.

In this case, suits were filed on February 8, 1993; the claimants causes of action must therefore have accrued no earlier than February 8, 1989. The bankruptcy court found, as did the district court in *131 Main Street,* that the claimants sustained their RICO injuries well before February 1989. *In re Bushnell,* 199 B.R. at 846; *131 Main Street,* 897 F.Supp. at 1516.

> By January 1988, then, all of the partners—plaintiffs included—knew that they had incurred tax-related expenses of a provable amount. And it was the partners' obligation to pay those expenses, not the actual payment as such, that counted as an economic injury for purposes of the accrual of RICO's statute of limitations.

*Id.*

Judge Sand found that these events, however, did not necessarily put the limited partners on inquiry notice of fraud. Although the limited partners were on notice that the IRS might challenge the deductions on losses claimed by the partnerships, they were not on notice of the risk that the trading activity which was supposed to generate the losses would simply not take place. Judge Sand concluded

> that there are genuine issues of material fact regarding the meaning and significance of the information conveyed to plaintiffs by the management of the limited partnerships (and by [their law firm]) over the course of the 1980's. We cannot conclude as a matter of law that the information was of such an unambiguous nature as to put plaintiffs on notice of the probability that they were defrauded.

*Id.* at 1521. The bankruptcy court concluded, however, that because the lead counsel appointed by the tax court knew of the possibility of a criminal investigation into the activities of Arbitrage Management as of December 1987, and by mid–1988 knew that a criminal investigation was in progress, knowledge of these matters was imputed to the claimants, putting them on inquiry notice of fraud. *In re Bushnell,* 199 B.R. at 847–48. In the alternative, he held that notice of the fraud was irrelevant, because all that is required in the Second Circuit is notice of injury. *Id.* at 849 (citing *Bankers Trust,* 859 F.2d at 1102, 1103, 1105).

*Bankers Trust* involved a case where the plaintiff's knowledge of the fraud preceded its discovery of its injury. The Second Circuit has applied *Bankers Trust* to bar suit where plaintiffs were on inquiry notice of the fraud and the injury simultaneously. *See, e.g., In re Merrill Lynch,* 154 F.3d at 59. The Second Circuit has not applied *Bankers Trust* to bar suit where plaintiffs could not reasonably have discovered fraud until some time after they learned of their injury.

■ This Court agrees with Judge Sand, that knowledge of the RICO injury is a necessary, but not a sufficient prerequisite of accrual. *131 Main Street,* 897 F.Supp. at 1514. The statute of limitations did not begin to run until the claimants had actual or inquiry notice of the injury and of the existence of fraud. This ruling is consistent with the Second Circuit's analysis of inquiry notice in *In re Merrill Lynch,* 154 F.3d at 60, where the court restated its injury discovery rule and held that "[i]nquiry notice is notice such that a reasonable investor of ordinary intelligence would have discovered the existence of the fraud" (internal quotation omitted). *See also In re Merrill Lynch,* 7 F.Supp.2d 256, 265–66 (S.D.N.Y.1997); *In re Integrated Resources, Inc.,* 851 F.Supp. at 567 (limitations period for a fraud-based RICO action commences when plaintiffs on notice of facts which should arouse suspicion).

■ The question remains, then, whether the claimants were on inquiry notice of the existence of fraud more than four years before they filed suit. The question of inquiry notice need not necessarily be left to a finder of fact if the facts from which knowledge of the fraud may be imputed are clear and

undisputed. *In re Merrill Lynch,* 154 F.3d at 60.

In *Manko II,* the tax court noted that the counsel it had appointed to pursue settlement negotiations with the IRS on behalf of Arbitrage Management partners "knew of the possibility of a criminal investigation as of December 1987." Attorney Janow, one of the tax case negotiators, and a defendant in *131 Main Street,* submitted an affidavit in the case at bar in which he stated that he represented many of the Arbitrage Management investors, and that he knew of the criminal investigation some time in 1987. He also stated that Attorney Kaplan, another of the tax case negotiators, represented many of the claimants. R. at 14. In July 1988 Attorney Kaplan received notice from counsel for the IRS that it was suspending consideration of settlement of Edelman's tax case at the request of the United States Attorney's Office. R. at 14(E). From these undisputed facts the bankruptcy court concluded that the tax case negotiators "knew, prior to February 9, 1989, that criminal investigations of Manko and Edelman were underway," *In re Bushnell,* 199 B.R. at 847, and held that "this knowledge of Claimants' counsel is imputed to Claimants." *Id.* at 848.

 The relationship between an attorney and the client he or she represents is one of agent and principal. *See, e.g., Veal v. Geraci,* 23 F.3d 722, 725 (2d Cir.1994); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 689 n. 9 (2d Cir.1983). An agent's knowledge will be imputed to a principal: a person has notice of a fact if his or her agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it. *Veal,* 23 F.3d at 725 (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958)). In addition to the facts cited by the bankruptcy court, however, there is evidence that the claimants did not have actual knowledge of the criminal investigation, R. at 9; that counsel did not represent all or even substantially all of the claimants, R. at 14(D); and that counsel had conflicts of interest either by virtue of their alleged involvement in the fraudulent scheme or because they represented individuals who were perpetrating the fraud. R. at 10(O), 10(Q), 10(T).

Examining the evidence in the light most favorable to the nonmoving party, resolving ambiguities and drawing reasonable inferences against the moving party, *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993), on this record this Court cannot conclude as a matter of law that the knowledge of counsel appointed to negotiate the tax cases on behalf of the general partners, Arbitrage Management and certain of the investors will be imputed to the claimants. Summary judgment was inappropriate; the decision of the Bankruptcy Court is hereby REVERSED and the matter remanded for further proceedings consistent with this opinion.